UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| URICA, INC., | CASE NO. CV 11-02476 MMM (RZx) |
| Plaintiff, | FINDINGS OF FACT AND CONCLUSIONS OF LAW |
| vs. | |
| PHARMAPLAST S.A.E. and MEDLINE INDUSTRIES, INC., | |
| Defendants. | |
| MEDLINE INDUSTRIES, INC., | |
| Counter/crossclaimant, | |
| vs. | |
| URICA, INC., URI-HEALTH & BEAUTY LLC, AFSHIN MOGHAVEM, and PHARMAPLAST S.A.E., | |
| Counter/crossdefendants. | |
| PHARMAPLAST S.A.E., | |
| Counterclaimant, | |
| vs. | |
| URICA, INC., URI HEALTH AND BEAUTY, LLC, and AFSHIN MOGHAVEM, | |
| Counterdefendants. | |

On February 25, 2011, Urica, Inc. ("Urica") commenced this action for inducing breach of contract against Medline Industries, Inc. ("Medline") in Los Angeles Superior Court.[1]  Medline removed the action to this court on March 24, 2011, invoking the court's diversity jurisdiction under 28 U.S.C. § 1332.[2]  On May 5, 2011, Urica filed a first amended complaint that named Pharmaplast S.A.E. ("Pharmaplast") as an additional defendant, alleged a breach of contract claim against it, and stated a new claim against Medline for breach of contract.[3]

On October 5, 2011, the court granted in part and denied in part defendants' motions to dismiss the amended complaint.[4]  Urica filed a second amended complaint on October 20, 2011.[5]  Medline answered on November 21, 2011, asserting a counterclaim against Urica, and a cross-claim against Pharmaplast,[6] which it subsequently moved to amend.[7]  The court granted the motion to amend, which was unopposed,[8] and on February 28, 2012, Medline filed an amended answer.  The answer included a counterclaim against Urica, URI Health and Beauty, LLC ("URI"), and Afshin Moghavem ("Moghavem")[9] for negligent and fraudulent misrepresentation, and a cross-

---

[1]Notice of Removal, Docket No. 1 (Mar. 24, 2011), Exh. A (Complaint).

[2]*Id.*

[3]First Amended Complaint ("FAC"), Docket No. 9 (May 5, 2011).

[4]Order Granting in Part and Denying in Part Defendants' Motions to Dismiss, Docket No. 29 (Oct. 5, 2011).

[5]Second Amended Complaint ("SAC"), Docket No. 32 (Oct. 20, 2011).

[6]Medline's Answer to the SAC and Crossclaim Against Pharmaplast, Docket No. 41 (Nov. 21, 2011).

[7]Medline's Motion to Amend its Answer, Docket No. 44 (Dec. 20, 2011).

[8]Urica's Notice of Non-Opposition to Motion by Defendant Medline for Leave to Amend, Docket No. 46 (Dec. 21, 2011) ; Notice by Pharmaplast of Non-Opposition to Motion by Defendant Medline to Amend, Docket No. 47 (Feb. 17, 2012).

[9]As discussed *infra*, there are other individuals with the surname Moghavem involved in this action, although they are not named defendants.  Throughout this order, the court will refer to Afshin Moghavem as "Moghavem."  It will refers to other members of Moghavem's family

claim against Pharmaplast for indemnity.[10]   On November 22, 2011, Pharmaplast answered the amended complaint; its answer included a counterclaim against Urica, URI, and Moghavem that pled claims for breach of contract, goods sold and delivered, open book account, intentional misrepresentation, and false promise.[11]

On January 24, 2013, Medline filed a motion for summary judgment on its claim against Pharmaplast and a separate motion for summary judgment on Urica's claims against it.[12]   On February 17, 2013, Pharmaplast filed a motion for summary judgment on Urica's claim against it.[13]   On February 19, 2013, Urica filed a motion for summary judgment on Medline's counterclaims against it.[14]   Medline and Urica subsequently filed a stipulation to dismiss Medline's counterclaims against Urica.[15]   The court then granted Pharmaplast's and Medline's motions for summary judgment on Urica's claims and denied Medline's motion for summary judgment on its claim for indemnity from Pharmaplast.[16]   On October 28, 2013, Pharmaplast and Medline filed a stipulation dismissing all claims by Pharmaplast against Medline and all claims by Medline

by their full names.

[10]Amended Answer to Second Amended Complaint, Cross-claim and Counterclaims of Defendant Medline, Docket No. 49 (Feb. 28, 2012).

[11]Pharmaplast's Answer to the SAC and Counterclaim Against Urica, URI, and Afshin Moghavem, Docket No. 40 (Nov. 22, 2013).

[12]Medline's Motion for Summary Judgment on Claim for Indemnification from Pharmaplast, Docket No. 104 (Jan. 24, 2013); Medline's Motion for Summary Judgment, Docket No. 105 (Jan. 24, 2013).

[13]Pharmaplast's Motion for Summary Judgment, Docket No. 109 (Feb. 17, 2013).

[14]Urica's Motion for Summary Judgment, Docket No. 110 (Feb. 19, 2013).

[15]Stipulation to Dismiss Counterclaims, Docket No. 122 (Mar. 25, 2013).

[16]Order Granting Pharmaplast's and Medline's Motions for Summary Judgment Against Urica and Denying Medline's Motion for Summary Judgment Against Pharmaplast, Docket No. 150 (May 6, 2013).

1   against Pharmaplast.[17]

2       There remained for trial only Pharmaplast's counterclaims against Urica, URI, and

3   Moghavem. On October 3, 2013, the parties filed a joint waiver of their right to a jury trial.[18]

4   The court thus held a bench trial on Pharmaplast's counterclaims from October 29 to October 31,

5   2013.[19] Following trial, both parties filed briefs that detailed what they believed the evidence had

6   established.[20] Having considered the evidence and the parties' arguments, the court makes the

7   following findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of

8   Civil Procedure.

9

10                          **I.  FINDINGS OF FACT**

11      **A.      Background Information**

12  1.  Pharmaplast is an Egyptian shareholding company, headquartered in Alexandria, Egypt.[21]

13      It manufactures wound care products.[22] Mamdouh Atteia is a Pharmaplast shareholder and

14      the company's vice-president.[23] He is also a pharmacist and has worked at the company

15      since 1985.[24] Atteia is currently Pharmaplast's Business Development Manager and

16

17      _____

18      [17]Stipulation to Dismiss, Docket No. 201 (Oct. 28, 2013).

19      [18]Waiver of Trial by Jury, Docket No. 194 (Oct. 3, 2013).

20      [19]Minutes of Court Trial (1st Day), Docket No. 211 (Oct. 29, 2013); Minutes of Court
21      Trial (2nd Day), Docket No. 212 (Oct. 30, 2013); Minutes of Court Trial (3rd Day), Docket No.
    213 (Oct. 31, 2013).

22      [20]Counterdefendants' Post-Trial Brief ("URI Brief"), Docket No. 221 (Nov. 18, 2013);
23      Pharmplast's Post-Trial Brief ("Pharmaplast Brief"), Docket No. 220 (Nov. 18, 2013).

24      [21]Reporter's Transcript of Court Trial, Day 2 Morning ("Oct. 30 Morning RT"), Docket
25      No. 217 (Nov. 15, 2013), at 239:11-14.

26      [22]Oct. 30 Morning RT at 240:5-7.

27      [23]_Id._ at 237:24-25, 245:8-13.

28      [24]_Id._ at 238:23-239:6.

                                4

1    Technical Manager.[25]  Atteia has dealt with URI on Pharmaplast's behalf since 2004.[26]

2    2.    Mamdouh Makram is Pharmaplast's Financial Director.[27]

3    3.    George Magdy is Pharmaplast's Sales Manager.[28]

4    4.    Ramy Edward is Pharmaplast's Manager of Artworks.[29]

5    5.    Urica is a California corporation that imports and distributes wound care products.[30]

6    Family members Moghavem, Alex Moghavem, Maru Moghavem, Ramin Moghavem, and

7    Sean Moghavem are Urica's shareholders.[31]  Moghavem, Ramin Moghavem, and Sean

8    Moghavem are the company's directors:[32]  Moghavem is the company's President and Sean

9    Moghavem is its Secretary and Treasurer.[33]

10   6.    On February 10, 2004, Urica and Pharmaplast entered into a contract ("the exclusivity

11   agreement") providing that Urica would be the exclusive distributor of Pharmaplast's

12   wound care products in the United States for the next ten years.[34]  Pursuant to the contract,

13   Urica was to pay Pharmaplast for the goods it ordered 90 days after the date on the bill of

---

[25]*Id.* at 238:1-3.

[26]*Id.* at 245:22-2467.

[27]Reporter's Transcript of Court Trial, Day 1 Afternoon ("Oct. 29 Afternoon RT"), Docket No. 202 (Oct. 30, 2013), at 165:15-16.

[28]*Id.* at 187:9-16.

[29]*Id.* at 187:17-22.

[30]Reporter's Transcript of Court Trial, Day 2 Afternoon ("Oct. 30 Afternoon RT"), Docket No. 207 (Nov. 1, 2013), at 397:10-398:2.

[31]*Id.* at 398:4-7.

[32]*Id.* at 398:11-13.

[33]Reporter's Transcript of Court Trial, Day 1 Morning ("Oct. 29 Morning RT"), Docket No. 216 (Nov. 15, 2013), at 39:9-14; Oct. 30 Afternoon RT 398:18-24.

[34]Exh. 3 (February 10, 2004 Agreement between Urica and Pharmaplast).

1    lading.[35]

2    7.    URI is a California limited liability company.[36]  URI was formed to order goods pursuant

3          to the exclusivity agreement between Urica and Pharmaplast.[37]  Urica and URI share the

4          same business address.[38]  Moghavem, Ramin Moghavem, and Sean Moghavem are URI's

5          members.[39]  Moghavem is the company's President and Amir Daroubakhsh – Moghavem's

6          brother-in-law – is the company's Vice-President.[40]

7    8.    Dave Caruso is the company's General Manager.

8    9.    Marcialito Benitez assisted URI in preparing purchase orders and bookkeeping.[41]

9    10.   At all relevant times, Teresa David was Moghavem's personal assistant.

10   11.   All of the business dealings conducted pursuant to the exclusivity agreement were between

11         URI and Pharmaplast.[42]

12   12.   From 2004 to 2010, pursuant to the exclusivity agreement, URI purchased wound care

13         products from Pharmaplast that it resold to chain stores in the United States.[43]  Typically,

14         URI initiated a purchase by submitting a purchase order, which Pharmaplast confirmed in

---

[35]*Id.*; Oct. 29 Afternoon RT at 145:8-12.

[36]Oct. 30 Afternoon RT at 399:6-10.

[37]Oct. 29 Morning RT at 35:9-15; Oct. 29 Afternoon RT at 144:22-145:6.

[38]Oct. 29 Morning RT at 34:6-17.

[39]Oct. 30 Afternoon RT at 399:17-20.

[40]Oct. 30 Morning RT at 224:2-24; Oct. 30 Afternoon RT at 400:13-14.

[41]Oct. 30 Afternoon RT at 408:24-409:2; Reporter's Transcript of Court Trial, Day 3 Morning ("Oct. 31 Morning RT"), Docket No. 218 (Nov. 15, 2013), at 467:14-17.

[42]See e.g., Exhs. 60 (September 13, 2010 Purchase Order), 66 (October 21, 2010 Purchase Order), 67 (October 21, 2010 Purchase Order), 227 (January 25, 2008 Purchase Orders).

[43]Oct. 29 Morning RT at 108:7-11.

a pro forma invoice issued to URI.[44]   Once Pharmaplast issued the pro forma invoice and received URI's approval of any changes contained therein, it issued an order to its production branch to start production on the order.[45]   URI generally did not give Pharmaplast specifications for the products it ordered – such as the exact width of the wound pad inside the bandage.[46]   Rather, it left the specifications to Pharmaplast's discretion; as a result, Pharmaplast produced product for URI using its standard specifications.[47]   It was Pharmaplast policy that it had to approve a customer's request that product be manufactured to the customer's specifications.[48]   After Pharmaplast manufactured the products, it packed them in retail boxes, placed the boxes in cardboard cartons, and placed the cartons inside large shipping crates.   Pharmaplast then issued a commercial invoice and a packing slip that inventoried the products being sent to URI.[49]   The goods were shipped to URI "Free on Board" ("FOB"), meaning URI paid the freight from Egypt to Los Angeles and assumed all risk of damage to the goods during shipment.[50]

---

[44]*Id.* at 61:1-4; Oct. 29 Afternoon RT at 167:6-16.

[45]Oct. 29 Afternoon RT at 167:15-16.

[46]Oct. 30 Afternoon RT at 369:16-25.

[47]*Id.*

[48]*Id.* at 413:20-21.

[49]Oct. 29 Morning RT at 61:15-20; Oct. 29 Afternoon RT at 169:6-12.

[50]Oct. 29 Morning RT at 61:25-62:7.   FOB is defined by the International Commercial Terms ("Incoterms"), published by the International Chamber of Commerce and incorporated in Article 9(2) of the United Nations Convention on Contracts for the International Sale of Goods ("CISG").   *BP Oil International, Ltd v. Empresa Estatal Petroleos de Ecuador*, 332 F.3d 333, 335 (5th Cir. 2003) (stating that the Incoterms "provide a set of international rules for the interpretation of the most commonly used trade terms in foreign trade.   Incoterms are recognized through their incorporation into [Article 9(2) of] the [CISG]"); *St Paul Guardian Insurance Co. v. Neuromed Medical Systems & Support, GmbH*, No. 00 CIV. 9344(SHS), 2002 WL 465312, *2 (S.D.N.Y. Mar. 26, 2002) ("INCOTERMS are incorporated into the CISG through Article 9(2)").   Both parties agree that the CISG and the incorporated Incoterms apply to the contract claims in this case.

7

URI typically directed Pharmaplast to use Expeditors International Ocean ("Expeditors") to ship the orders from Alexandria, Egypt to the port in Charlotte, North Carolina.[51] Because URI was the party paying Expeditors, Expeditors would not ship the goods unless URI approved the shipment.[52]

13.    At certain points during the period from 2004 to 2010, URI fell behind on its payments to Pharmaplast for goods ordered under the exclusivity contract.  The amount of the overdue payments reached highs of $827,892.59 on June 11, 2006, and $761,859.73 on October 27, 2007.[53]  URI also fully paid its debt several times over the years, however, with the result that Pharmaplast owed URI $50.88 on May 11, July 20, November 9, and December 31, 2009 and March 25, May 9, and July 19 of 2010; and June 1, 2011.[54]

**B.    The 2008 Purchase Orders**

14.    On January 25, 2008, URI sent Pharmaplast five purchase orders: order numbers 219, 220, 221, 222, and 223.[55]  Each purchase order was for a different type of product.[56]  The price per unit for the products in purchase orders 219 through 223 were, respectively, $0.252, $ 0.178, $ 0.23, $ 0.298, and $ 0.385.[57]   The total purchase price was

---

[51]Oct. 29 Morning RT at 61:25-62:7.

[52]Reporter's Transcript of Court Trial, Day 3 Afternoon ("Oct. 31 Afternoon RT"), Docket No. 208 (Nov. 1, 2013), at 618:16-619:7.

[53]Exh. 209 (Pharmaplast Balance Sheet for URI).

[54]*Id.*  The credit amount was not explained at trial.

[55]Exh. 227-1 (Purchase Order ("PO") 219: 400 Fabric Bandages), 227-2 (PO 220: 1,200 Sports Tapes), 227-3 (PO 221: 850 Adhesive Bandages), 227-4 (PO 222: 1,200 Plastic Bandages), 227-5 (PO 223: 2,000 Plastic Assorted Bandages).

[56]*Id.*

[57]Exh. 227.  These numbers are obtained by dividing the case price listed in the purchase order by the number of units per case.  The number of units per case for purchase orders 219-222 was 72; the number of units per case for purchase order 223 was 24.  Pharmaplast believed that URI had erroneously ordered the wrong goods in purchase order 220 by entering code 10012 instead of 10002.  Consequently, it produced and shipped 10002 goods rather than 10012 goods.

8

$80,940.00, due 90 days after the bill of lading date.[58]

15.    Pharmaplast manufactured the goods requested in the five purchase orders and shipped them to URI on or about February 22, 2008.[59]

16.    The Commercial Invoice generated by Pharmaplast reflected unit prices higher than those listed on the purchase orders for orders 219-223.[60]   The unit prices reflected on Pharmaplast's invoice for the goods covered by purchase orders 219-223 were $ 0.27,[61] $0.24,[62] $ 0.28, $ 0.37, and $ 0.47, respectively.[63]   As a result, the invoice reflected a total purchase price of $95,856.00, due 90 days after the bill of lading date.[64]   The discrepancy occurred because Pharmaplast had raised the price of the goods without obtaining URI's approval.[65]   URI did not know that Pharmaplast was going to charge it a higher unit price than that reflected on the purchase orders until it received the commercial invoice; this was after the goods had already been manufactured, produced, and shipped.[66]

---

(Oct. 30 Morning RT at 271:21-272:5; Oct. 31 Morning RT at 473:14-474:5.) The price per unit for the 10002 goods was $0.178. (Exh. 232 (Amended Commercial Invoice).)

[58]Exhs. 227-1 (Purchase Order ("PO") 219: 400 Fabric Bandages), 227-2 (PO 220: 1,2000 Sports Tapes), 227-3 (PO 221: 850 Adhesive Bandages), 227-4 (PO 222: 1,200 Plastic Bandages), 227-5 (PO 223: 2,000 Plastic Assorted Bandages); Exh. 15 at 2 (April 21, 2008 email from Atteia to Benitez) ("W[e] recalculated invoice #4 with old prices.  Diff[e]rence is [$]15[,]000 USD!!!! [The] [v]alue of [the] invoice became [$]80[,]400.00 USD instead of [$]95[,]856.00").

[59]Exhs.  228 (February 7, 2008 Packing List for POs 219-223), 230 (February 22, 2008 Bill of Lading for POs 219-223), 231 (February 7, 2008 Commercial Invoice for POs 219-223).

[60]Oct. 30 Morning RT at 271:21-272:5.

[61]Exh. 231 (February 7, 2008 Commercial Invoice for POs 219-223).

[62]Oct. 30 Morning RT at 271:21-272:5.

[63]Exh. 231 (February 7, 2008 Commercial Invoice for POs 219-223).

[64]*Id.*

[65]Oct. 29 Morning RT at 110:21-111:10.

[66]Oct. 31 Morning RT at 469:18-21.

17.   When the goods reached the port in Charlotte on March 13, 2008, URI refused to take delivery of them and told Pharmaplast it would not pay the full price listed on the invoice because it had not agreed to that price; URI stated it would only pay the lower price reflected in its purchase orders.[67]

18.   The goods remained at the port from March 13 to May 17, 2008 while the parties argued about the price differential.[68]

19.   On May 1, 2008, Atteia told Moghavem that if URI wanted the goods released, it could pay the lower purchase price reflected in the purchase orders in cash, or pay the higher price reflected on Pharmaplast's commercial invoice 120 days from the bill of lading date.[69]  On May 15, 2008, the parties agreed during a telephone call that URI would pay $76,000 in cash for the goods, which represented the $80,940.00 originally reflected in the purchase orders minus half the cost of the demurrage – or storage – that had accrued during the time the goods remained at the port.[70]

20.   On May 17, 2008, Pharmaplast issued an amended commercial invoice covering purchase orders 219-223.[71]  URI wire-transferred Pharmaplast $76,000, and Pharmaplast released

----

[67]Exhs. 13 (May 1, 2008 Email from Atteia to Moghavem), 14 (May 4, 2008 Email from Atteia to Moghavem).

[68]Oct. 29 Morning RT at 114:4-11;Exh. 397 (April 21, 2008 Email from Atteia to Moghavem).

[69]Exh. 397 (April 21, 2008 Email from Atteia to Moghavem).

[70]Oct. 29 Morning RT at 119:12-21.  Following the call, Atteia sent Moghavem an email confirming that he and Moghavem had agreed that "Pharmaplast w[ould] change the issued invoice to [reflect the company's] old prices before [it initiated a price] increase[, leading to a total] around [$]81,500.00[, that] Pharmaplast [would] make a discount on th[e] invoice of [$]5,500.00 [ ] which [wa]s 50% of the demurrage on th[e] 2 containers [such that] the [total] invoice value w[ould] be [$]76,000.00[, and that] URI w[ould] wire transfer Pharmplast [the] value of this discounted invoice" in exchange for Pharmaplast releasing the goods and all shipping documents the same day.  (Exh. 405 (May 15, 2008 email from Atteia to Moghavem).)

[71]Exh. 232 (May 17, 2008 Commercial Invoice for POs 219-223).

the bill of lading to URI, so that it could collect the goods.[72]

21.   Although Atteia did not tell Moghavem at the time that he felt he was being coerced to lower the price Pharmaplast would accept for the products,[73] he testified at trial that he felt "blackmailed" to accept a lower purchase price for the shipped goods because URI owed Pharmaplast a great deal of money.[74]   In February 2008, when the goods left Egypt, URI owed Pharmaplast approximately $500,000.[75]   During the months of March and April 2008, however, URI made several payments, which brought the remaining balance down to $291,088.62 by April 20, 2008.[76]   During the time the parties were disputing the contract price, Pharmaplast also had $500,000 worth of product it had manufactured for URI marked with URI's proprietary brand sitting in Pharmaplast's warehouse awaiting shipment.[77]   Pharmaplast's bank, moreover, with which Pharmaplast had a factoring agreement had recently refused to finance any new purchases by URI,[78] a development that caused Pharmaplast to decide it would change the payment terms on future URI orders to a letter of credit or cash against documents ("CAD").[79]

22.   Atteia testified that Pharmaplast did not agree to the price reduction freely, but felt forced

---

[72]Oct. 29 Morning RT at 117:8-13.

[73]Id. at 117:20-23.

[74]Oct. 30 Morning RT at 252:12-20.

[75]Exh. 209 at 4 (Pharmaplast's Balance Sheet for URI).

[76]Id. at 5 (Pharmaplast Balance Sheet for URI).

[77]Oct. 30 Morning RT at 263:15-20.

[78]Id. at 253:8-254:4.

[79]Oct. 29 Afternoon RT at 145:21-25; 147:24-148:3; Oct. 30 Morning RT at 248:20-249:4. When payment terms are CAD, the seller sends the buyer a copy of the bill of lading, invoice, and packing list, the buyer pays the seller once the goods reach the port, and the seller then releases the original bill of lading, invoice, and packing list, allowing the buyer to collect the goods from the port.  (Oct. 29 Morning RT at 95:20-97:23; Oct. 29 Afternoon RT at 193:4-15.)

to do so because it did not want to risk not being paid the outstanding sums URI owed.[80]
Atteia testified he believed the risk of URI's nonpayment of these amounts "threaten[ed] the future of [Pharmaplast]."[81]

23.  At approximately the same time the products were sitting in the port, URI was also pressuring Atteia to sign an agreement to pay URI commissions on Pharmaplast's sales of product to Medline.[82] Moghavem often called Atteia after midnight in Egypt to discuss the matter.  Atteia testified that ultimately Pharmaplast decided not to bow to URI's pressure, and "stopped th[e] issue completely."[83]  He said he believed that URI hoped it could "squeez[e] [Pharmaplast's] throat" by refusing to pay for the products that had been shipped until Pharmaplast agreed to sign the commission agreement.   When Pharmaplast decided not to bow to URI's pressure, however, and refused to sign a commission agreement, URI had to accede because it needed product and could not replace Pharmaplast as its supplier quickly enough to avoid harm to its business.[84]

C.    **The 2010 Purchase Orders**

24.  In 2010, URI decided to pursue a new product line to be sold to institutional, non-hospital customers.[85] Moghavem spoke with Atteia multiple times regarding Pharmaplast's interest in participating as the manufacturer in this new endeavor, and building a new product line with specifications different than those used for retail products.[86]  Pharmaplast agreed to participate.

---

[80]Oct. 30 Morning RT at 266:11-18.

[81]*Id.* at 266:15-18.

[82]Exh. 4 (Commission Agreement).

[83]Oct. 30 Morning RT at 256:2-10.

[84]*Id.* at 255:22-256:12.

[85]Oct. 29 Morning RT at 39:15-40:25; *id.* at 108:18-109:6.

[86]*Id.* at 41:1-8.

25.     In July 2010, URI sent representatives – including Daroubakhsh, Caruso, and Bolling – to Egypt to meet with Pharmaplast representatives – including Atteia, Magdy, and Makram.  The parties discussed the new venture for approximately three days.  Among the topics they covered were the products URI wished to have Pharmaplast manufacture and its packaging and specification requirements.[87]  URI wanted the products to match the specifications of its competitor's products.  To that end, the URI representatives brought samples of the competitor's products to the meeting to show Pharmaplast what the new line should look like and how it should be packaged.[88]  URI requested that Pharmaplast match the specifications of its competitor's products exactly.[89]  Specifically, URI wanted to replicate the weight of the corrugated cardboard carton holding the products.[90]  It also wanted to match the slot strips and the size of the prep and gauze pads.[91]  It specified that the bandages should all have a z- rather than a j-fold.[92]  It also specified that the products needed to have an offset release liner and asked Pharmaplast to match the release liner in the samples it had brought exactly.  URI requested that the bandages be packed "soldier style"[93] so they could be removed from the box one at a time rather than being packed in such a way that each bandage was attached to other bandages that a person had to detach

---

[87]*Id.* at 46:13-21; 47:18-48:2; Oct. 31 Morning RT at 496:4-7; Exh. 304 (July 18, 2010 email from Caruso to Atteia regarding upcoming trip to Egypt).

[88]Oct. 29 Morning RT at 48:7-13.

[89]Oct. 31 Morning RT at 490:22-491:2.

[90]*Id.* at 484:21-485:17.

[91]*Id.*

[92]*Id.*  A bandage has a z-fold when the top flap of one side of the wrapper is folded over. A bandage has a j-fold when the top flaps of both sides of the bandage wrapper line up together. (Oct. 31 Morning RT at 487:20-488:2.)

[93]Soldier style means that each bandage is individually wrapped and packed in a single-file line within the box.  (Oct. 31 Morning RT at 502:12-503:4.)

before he or she could unwrap the individual bandage.[94]  The z-fold, offset release liners, and soldier-style packing were important features of the new product line because they allow institutional users such as nurses and food workers to open bandages while wearing latex gloves.[95]   At the meeting, URI and Pharmaplast representatives also discussed artwork for the boxes and wrappers, including specifications for the label printer.[96]  They discussed planning, forecasting, and lead times,[97] as well as the bulk products URI would purchase, including the size of the cases in which they would be packed and the number of bulk rolls to be packed inside each case.[98]  URI wanted its bulk products to come packaged in rolls of bandages put directly into cases rather than into much smaller retail boxes.  The number of bandage rolls per case and the size of the cases was important to URI because it planned to sell the products in bulk to distributors that would in turn resell to institutional clients.  The distributors had spaces of a specific size for product storage and, URI believed, would not purchase bulk rolls unless they were packed in boxes that would fit on their shelves.[99]

26.     In July 2010, Caruso sent Makram a list of products URI intended to order, together with the dimensions of the cases in which bulk product was to be packed, and the number of

---

[94]Oct. 31 Morning RT at 502:12-503:4.

[95]*Id.* at 490:6-12.  Release liners are the backing paper attached to the sticky side of the bandage inside a bandage wrapper.  An offset release liner provides a more sterile, cleaner method of applying a bandage because one can open the bandage without touching the gauze pad inside.  (*Id.* at 489:20-490:5.)  Z-fold bandages are easier to open than j-fold bandages when an individual is wearing gloves, because the individual can hold on to the folded flap; a j-fold bandage is more difficult to open because the tops of the bandage wrapper line up and are very close together.  This makes it more difficult for someone wearing gloves to pull them apart.  (*Id.* at 487:11-488:15.)

[96]*Id.* at 485:18-19.

[97]*Id.*

[98]*Id.* at 491:9-10.

[99]*Id.* at 491:9-23.

14

1   rolls to be placed in each case.[100]

2   27.   The parties continued to discuss the specifications and timing of orders for the new product

3          line by telephone.  There were also face-to-face meetings in Miami, Florida in August

4          2010, and Dusseldorf, Germany in November 2010, both of which lasted several days.[101]

5          Daroubakhsh, Bolling, Rojas, Caruso, and Moghavem attended the meetings on behalf of

6          URI.[102]   Atteia and Makram, among others, represented Pharmaplast.[103]   During these

7          meetings, Moghavem told Atteia there would be no problems with late payments by URI

8          because the price margin for institutional sales was greater than the retail margin.  As a

9          result, he stated, URI would have no problem paying invoices on time, and would not

10         delay payment as it had on orders of retail products.[104] For their part, on several occasions,

11         Pharmaplast's representatives assured their URI counterparts that the company understood

12         the specifications for the new product line and could produce product meeting the

13         specifications on the schedule URI had outlined.

14   28.   On September 13, 2010, URI submitted purchase order 379, the first of several orders it

15         intended to place for the new product line.[105]  The purchase order reflected a shipment date

16         of December 20, 2010 and a total purchase price of $229,869.05 to be paid CAD.[106]

17         Purchase Order 379 specified that some of the products to be shipped in bulk were to be

18

19   _____

20   [100]Exh. 303 (July 12, 2010 email chain between Makram and Caruso).

21   [101]Oct. 30 Morning RT at 275:13-276:3; Oct. 31 Morning RT at 497:1-6.

22   [102]Oct. 31 Morning RT at 495:15-24.

23   [103]*Id.* at 499:3-6.

24
25   [104]Oct. 30 Morning RT at 275:13-277:3.

26   [105]Exh. 60 (September 13, 2010 PO 379).  The purchase order was later amended to reflect
     minimum order quantities and resubmitted in an email dated October 24, 2010.  (Exh. 318
27   (October 24, 2010 email from Lutz to Magdy).)

28   [106]*Id.* at 12; Oct. 29 Morning RT at 95:20-97:23; Oct. 29 Afternoon RT at 193:4-15.

1    packed "3 rolls per case."[107]  It specified that others be packed 4, 6, or 12 rolls per case.[108]

2    29.    Other than the inclusion of this information in the purchase order, and a July 2010 email

3           from Caruso to Makram that specified the dimensions of the cases in which the bulk

4           products were to be packed, and the number of bandage rolls to be packed in each case,

5           URI gave Pharmaplast no written specifications to use in fulfilling purchase order 379.

6           Pharmaplast did not complain about the lack of written specifications, however, or tell URI

7           it needed further, written specifications before it could manufacture the products.[109]

8    30.    On October 25, 2010, Pharmaplast issued a pro forma invoice for the goods specified in

9           purchase order 379.[110]

10   31.    On October 21, 2010, URI submitted purchase order 383.[111]  This purchase order specified

11          a February 20, 2011 shipping date and a total order price of $172,297.20.[112]  The next day,

12          on October 22, 2010, URI submitted purchase order 384.[113]  This order reflected a

13          shipping date of January 20, 2011 and a total price of $149,195.16.[114]  The goods ordered

14          in the three purchase orders were the same; only the amounts varied.[115]

15   32.    URI had accepted customer purchase orders for the new product line prior to placing

16          orders with Pharmaplast.[116]

17   ──────────────────

18   [107]Exh. 60 at 8 (September 13, 2010 PO 379).

19   [108]*Id.* at 9-10.

20   [109]Oct. 31 Afternoon RT at 580:17-22.

21   [110]Exh. 218 (October 25, 2010 Pro Forma Invoice for PO 379).

22   [111]Exh. 66 (October 21, 2010 PO 383).

23   [112]*Id.* at 13.

24   [113]Exh. 67 (October 22, 2010 PO 384).

25   [114]*Id.* at 11.

26   [115]Oct. 30 Morning RT at 302:24-303:5.

27   [116]Oct. 29 Morning RT at 69:21-70:7; *id.* at 94:7-21; *id.* at 497:7-11.

28

33.   URI never requested an inspection certificate for these or any goods it received from Pharmaplast.[117]   Moghavem stated that URI had never had an issue with the quality of goods it received from Pharmaplast.[118]

34.   Pharmaplast issued pro forma invoices for purchase orders 383 and 384 on October 25, 2010.[119]

35.   Pharmaplast manufactured all of the products needed to fulfill the three purchase orders at the same time.[120]

36.   Pharmaplast manufactured the goods for purchase orders 379, 383, and 384 under URI's proprietary brand, "SmarTherapy."[121]

37.   The goods fulfilling purchase order 379 were not shipped on December 20, 2010; rather, shipment was delayed to February 13, 2011 for several reasons.[122]   First, Pharmaplast did

---

[117]*Id.* at 98:13-99:9; *id.* at 115:15-23.

[118]*Id.* at 115:24-116:2.

[119]Exhs. 222 (October 25, 2010 Pro Forma Invoice for PO 383), 223 (October 25, 2010 Pro Forma Invoice for PO 384).

[120]URI placed the three purchase orders in quick succession and Pharmaplast manufactured the products simultaneously because each individual purchase order covered fewer goods than Pharmaplast's minimum order quantity requirement; Pharmaplast had such a requirement because it was not economical to produce smaller quantities of goods.  (Oct. 30 Morning RT at 297:24-298:16; Exh. 65 (April 4, 2011 email from Atteia to Moghavem) (stating that Pharmaplast had "produced [the goods reflected in] all [of URI's] three purchase orders").)  Because of the problems that subsequently developed, Pharmaplast never packed the products it manufactured for purchase orders 383 and 384 in the boxes it had manufactured for them.  Indeed, it did not assemble the boxes.  (Oct. 30 Morning RT at 218:13-25; Exh. 367 (February 23, 2011 email from Edward to David).)  The goods and boxes manufactured to fulfill purchase orders 383 and 384 are currently in Pharmaplast's warehouse in Egypt.  (Oct. 30 Morning RT at 298:22-23; *id.*at 302:24-303:12.)

[121]Oct. 29 Morning RT at 65:20-66:22; Oct. 29 Afternoon RT at 143:9-21; Exh. 224 (Photographs of Physical Evidence).

[122]Exh. 220 (February 13, 2011 Bill of Lading).

not get bandage wrappers delivered sufficiently in advance of the manufacturing phase.[123] Second, there was a problem with the artwork for the boxes, which URI and Pharmaplast were producing jointly.[124]   Finally, the civil uprising in Egypt closed roads and ports, frustrating Pharmaplast's attempts to ship the goods.[125]

38.   Prior to shipment, in September, October, and November 2010, Pharmaplast sent URI sample products from its factory.[126]   In December 2010 and January 2011, Pharmaplast sent URI sample products from its production run.[127]   In all, Pharmaplast sent samples for all but five of the products URI had ordered.[128]   URI received several of the samples after the goods shipped in February.   Only the samples Pharmaplast sent in January, moreover, were boxed.[129]   URI complained about these issues and asked several times for a complete set of samples from the production run that were boxed but Pharmaplast did not comply.[130]

39.   In January 2011, as Pharmaplast was preparing to box and pack the products it had manufactured for purchase order 379, Magdy and Edward exchanged a number of emails on which Daroubakhsh, David, and others were copied.   In the emails, Magdy and Edward discussed the number of rolls of bulk product Pharmaplast would pack in each case and the

---

[123]Oct. 31 Morning RT at 508:1-5.

[124]*Id.* at 508:8-16.

[125]Oct. 29 Morning RT at 70:14-17.

[126]Oct. 31 Morning RT at 534:16-17.; Exhs. 245 (September 28, 2010 TNT Shipping Notification), 247 (November 10, 2010 TNT Shipping Notification).

[127]Oct. 31 Morning RT at 534:16-17.; Exh. 245 (September 28, 2010 TNT Shipping Notification); 247 (November 10, 2010 TNT Shipping Notification).

[128]Oct. 30 Morning RT at 230:17-23; *id.* at 231:11-13.

[129]Oct. 31 Morning RT at 534:16-17.

[130]Oct. 30 Morning RT at 231:14-23.

diameter of the cases.[131]  The two concluded that Pharmaplast would use its standard size case and vary the number of rolls per case depending on how many rolls fit; some rolls were larger than others because of the product dimensions and the number of bandages per roll URI had requested.[132]

40.   In response to the emails, Daroubakhsh sent an email to Atteia stating: "We cannot change the case packs at this point[.]  [W]e used (and need to maintain) the case packs that are standard in the industry and [we] have already marketed and received orders from our customers based on our ordered case packs.  You have had the orders for several months and need to maintain the originally accepted configuration."[133]  Atteia forwarded the email to Edward, Magdy, and others, with the message: "All, pl[ease] read below and do exactly as [Daroubakhsh] requests."[134]

41.   At this point, URI believed it would receive bulk goods that met the specifications identified in its purchase orders, emails, and discussions with Pharmaplast.  This did not occur, however.  Atteia testified he knew that Pharmaplast packed more rolls per case than URI had specified, and did not tell URI it had done so.  He said Pharmaplast made this decision since it was not possible to satisfy URI's order for special dimension cases because it did not meet the minimum order quantity of Pharmaplast's printer.  Atteia also testified that Pharmaplast took this action because URI was pressuring it to ship the goods as fast as possible.[135]

42.   In January, Atteia told URI that it should not come to Alexandria to resolve the issues

---

[131]Exh.379 at 9-11 (October 24, 2010 to March 10, 2011 email chain between various URI and Pharmaplast employees).

[132]*Id.* at 9 (January 4, 2011 emails from Magdy and Edward to Daroubakhsh, Atteia, David, and others).

[133]*Id.* at 8.

[134]*Id.* at 8.

[135]Oct. 30 Afternoon RT at 370:20-372:18.

because of political instability resulting from the civil uprising.[136]

43.   Pharmaplast prepared a packing list and commercial invoice for purchase order 379 on February 2, 2011,[137] and shipped the goods on February 13, 2011.[138]

44.   On February 24, 2011, Daroubakhsh emailed Atteia regarding URI's concerns with the most recent product samples it had examined.[139]   Daroubakhsh noted first that some of the bandages were packaged soldier-style while others were packaged haphazardly with many bandages connected to one another.[140]   Second, he said the bandages on most of the samples URI had received had j-folds rather than z-folds.[141]   Third, Daroubakhsh reported that the release liner on the samples was in the middle of the pad instead of being offset – halfway between the edge of the bandage and the release pad.[142]   Fourth, the clear bandages URI had ordered were more opaque than transparent.[143]   (In response to this complaint, Pharmaplast advised URI that it had used a different coating process, something it had not warned URI it intended to do.)[144]   Fifth, URI had ordered some blue bandages; the dye on these bandages had bled onto the offset release liner and wrapper.[145]   This

---

[136]Exh. 381 (March 13, 2011 Email from Atteia to Moghavem).

[137]Exhs. 59 (February 2, 2011 Commercial Invoice for PO 379), 219 (February 2, 2011 Packing List for PO 379).

[138]Exh. 220 (February 13, 2011 Bill of Lading).

[139]Exh. 369 (February 24, 2011 Email from Daroubakhsh to Atteia).

[140]Oct. 31 Morning RT at 518:22-519:7.

[141]Exh. 369 (February 24, 2011 Email from Daroubakhsh to Atteia).

[142]Oct. 31 Morning RT at 525:1-24.

[143]Exh. 369 (February 24, 2011 Email from Daroubakhsh to Atteia).  URI had never had a problem with clear bandages it had ordered from Pharmaplast in the past.  (*Id.*)

[144]Oct. 31 Morning RT at 527:20-528:4.

[145]*Id.* at 528:23-529:4; Exh. 369 (February 24, 2011 email from Daroubakhsh to Atteia).

caused URI to worry because the bandages were to be used by people in food processing plants who would be hesitant to handle food using bandages that might stain the food.[146] URI also worried because it had planned to start a subline of three blue bandages. It had already had to abandon one of these, and did not believe it would be able to market the ones Pharmaplast sent that were bleeding; this left it with only one blue bandage, which was not sufficient to start a subline.[147] On February 28, 2011, David emailed a Pharmaplast employee named Mina Adel that the blue dye was bleeding and it would be impossible for URI to sell the bandages in such a condition.[148] Atteia responded, stating that it was the "[f]irst time [Pharmaplast had made] blue polyurethan[e] film and [we] will never do it again as we do not have this technology[.] . . . I will not produce [your] second order [until the] first reaches you and you sell it and send all comments[.] We will discount the shipped blue PU bandages from your next invoice. Pl[ease] scrap it."[149] Finally, URI complained that the labels on the boxes listed product measurements in millimeters, although Pharmaplast knew URI was located in the United States and URI's purchase order had specified inches.[150]

45.   On March 9, 2011, after URI received the packing list for the purchase order 379 goods, Moghavem emailed Atteia with a number of concerns, including, *inter alia*, that the packing list indicated that the bulk products URI requested – and had been told would be

---

[146]Oct. 31 Morning RT at 530:7-19.

[147]*Id.* at 530:7-19.

[148]Exh. 373 (February 24, 2011 email chain between David and various employees of Pharmaplast).

[149]*Id.*

[150]Oct. 31 Morning RT at 550:4-10.   URI also complained that the perforations on the boxes were not deep enough to allow someone easily to remove the perforated section (*Id.* at 525:18-526:7). It also asserted that some of the bandages faced inward inside the wrapper while others faced outward, and that it wanted the direction of the bandages faced to be uniform. This packaging issue was not a serious problem for URI, but one URI wanted Pharmaplast to standardize in the future so the product would be more reliable. (*Id.* at 522:15-523:14.)

1   – packed 3 rolls to a case had instead been packed 4, 6, and 12 rolls per case.  This

2   reduced the total number of cases from 75 to 57.[151]

3   46.   On March 10, 2011, Magdy responded to Moghavem's email.  He stated that Pharmaplast

4   "normally use[d] [its] standard cases [for bulk packed products], and we ourselves specify

5   the n[umber] of plasters or rolls inside[.]   [W]e have never been informed that URI

6   intended to sell th[ese] rolls directly [in] our shipping case[.]  [I]f so, then we should have

7   been informed [of] what levels to [put in] the cases, [whether to use] any polybags . . . for

8   each roll, and [whether to place] carton separators between [the] rolls."[152]

9   47.   The purchase order 379 goods arrived at the port in Charlotte, North Carolina, on March

10   12, 2011, and remained there while the parties addressed these issues.[153]

11   48.   Based on Pharmaplast's representations, the packing list, and the few samples it had

12   received, URI believed that approximately 50 percent of the goods did not conform to the

13   specifications in the purchase orders and URI's discussions with Pharmaplast.[154]   URI

14   spoke with a bonded warehouse; it said it could not determine the cost of repacking the

15   bulk products until it saw the goods.[155]

16   49.   URI made several offers to Pharmaplast to resolve the situation.  First, it offered to pay

17   the invoice amount minus $50,000, which Moghavem testified was an estimated price for

18   repackaging and bringing the goods up to the specifications.  Pharmaplast believed that the

19   $50,000 number represented commissions Moghavem thought Pharmaplast owed URI on

---

22   [151]Exh. 379 (October 24, 2010 to March 10, 2011 email chain between various URI and

23   Pharmaplast employees); Oct. 31 Morning RT at 544:3-5.

24   [152]Exh. 379 (October 24, 2010 to March 10, 2011 email chain between various URI and

25   Pharmaplast employees).

26   [153]Exh. 65 (April 4, 2011 email from Atteia to Moghavem and others).

27   [154]Oct. 29 Morning RT at 67:20-24.

28   [155]Oct. 31 Morning RT at 545:9-12.

sales to Medline under the agreement Pharmaplast had refused to sign.[156]   Second, URI
offered to put the products in a bonded, third-party warehouse so a third party could
determine the extent to which the goods complied or did not comply with the purchase
order, and provide a price for any needed modifications.[157]   Third, URI offered to pay 50
percent of the purchase price, calculate the cost of modifying the goods to meet
specifications itself, and pay Pharmaplast any difference between the remaining half of the
purchase price and the modification cost.[158]   Pharmaplast refused these offers and insisted
that URI accept delivery of the goods and pay the purchase price.   URI refused.[159]

50.    On April 25, 2011, Pharmaplast decided to return the goods to Egypt.  It paid $17,442.30
for accrued demurrage on the two containers and for their return shipment to Egypt.[160]
The goods are currently stored in Pharmaplast's warehouse in Egypt.[161]  URI never paid
the commercial invoice issued for purchase order 379.[162]

51.    A statement of account prepared by Pharmaplast's accountants reflects that as of June 1,
2011, after accounting for the return of the purchase order 379 products, Pharmaplast
owed URI $50.88.[163]

### D.    Facts Relevant to Pharmaplast's Fraud Claims

45.    At trial, Atteia testified that he believed URI tried to blackmail him when it refused to take
delivery of the goods that arrived in Charlotte in March 2008 and said it would not pay

---

[156]Oct. 29 Morning RT at 78:1-16.

[157]Oct. 29 Afternoon RT at 133:9-19.

[158]Exh. 386 (March 22, 2011 Email from Moghavem to Atteia).

[159]Oct. 29 Afternoon RT at 133:9-19.

[160]Exh. 221 (May 4, 2011 Invoice from Expeditors to Pharmaplast).

[161]Oct. 30 Morning RT at 297:5-8.

[162]Oct. 29 Afternoon RT at 173:24-25.

[163]Exh. 209 (Statement of Account for URI).

23

full invoice price for the goods.  He testified that he never "trust[ed] Afshin Moghavem after what happened in 2008.  [He never] trust[ed] him at all."[164]

46.   In 2010, when the parties met in person and spoke by telephone concerning the institutional market venture, Moghavem told Atteia the parties had to forget the past and start anew. He assured Atteia that everything would be fine once the parties entered into a joint venture together.   As noted, Moghavem said that URI would pay for the goods CAD, and represented that the margin on sales to institutional businesses was so much higher than on retail sales that URI would have no problem making timely payments.[165]

47.   Atteia testified that although Pharmaplast's partners were frustrated by URI's prior failure to make timely payments, he convinced them to go into the new venture with URI based on these representations.[166]  He stated that Pharmaplast had relied on the representations in deciding to produce and ship the purchase order 379 goods, and that he would not have done so had he known there would be a problem extracting payment from URI.[167]

48.   On March 31, 2011, while the purchase order 379 goods sat in the port, Moghavem telephoned Atteia and asked for a commission on Pharmaplast's business with Medline; this was the same commission Moghavem had requested in 2008.  Atteia told him the "door was closed" on that issue, that he would not discuss it further, and that there was no relationship between Medline and the goods sitting in the harbor.[168]

49.   After this conversation, Moghavem sent Atteia an email in which he suggested URI could open a letter of credit to cover the cost of the purchase order 379 goods, "with a deduction of $50,000 to allow for the following: 1) have the container received at our third party

---

[164]Oct. 30 Afternoon RT at 424:14-15.

[165]Oct. 30 Morning RT at 276:9-277:3.

[166]*Id.* at 328:17-25.

[167]*Id.* at 277:4-10.

[168]*Id.* at 279:7-21.

logistics and assess the cost of rework that need[s] to be done to the goods shipped by you as they do not conform with our order from you.  We had asked you to give us an estimate and [you] refused to do so[.]  [O]therwise, we would have an accurate amount that we would have requested you to deduct.  2) Give you time to provide us with an accounting on monies owed to us from your sale of product to Medline.  3) We would then pay you what was not used for the rework of the product prior to the 120[ ] day [letter of credit] period you granted us."[169]

50.   URI retained Rojas and Bolling as contractors to help it sell the institutional product line at a cost of more than $150,000.[170]   It also spent approximately $100,000 to visit Pharmaplast, customers, and trade shows.[171]

51.   Any conclusions of law that are deemed to be findings of fact are incorporated herein as such.

## II.  CONCLUSIONS OF LAW

### A.      Pharmaplast's Breach of Contract Claims

52.   Pharmaplast asserts two breach of contract claims against defendants – one for breach of the 2008 contract reflected in purchase orders 219 through 223 and one for breach of the 2010 contract formed reflected in purchase orders 379, 383, and 384.

#### 1.      Legal Standard Governing Breach of Contract Claims Under the United Nations Convention on Contracts for the International Sale of Goods

53.   The parties agree that Pharmaplast's breach of claims are governed by the United Nations Convention on Contracts for the International Sale of Goods("the CISG"), which applies to contracts for the sale of goods between parties whose places of business are in different

---

[169]Exh. 235 (March 31, 2011 Email from Moghavem to Atteia).

[170]Oct. 31 Morning RT at 500:19-501:10.

[171]*Id.* at 501:16-24.

countries that are both signatories to the treaty.[172] CISG, Art. 1 ("This Convention applies to contracts of sale of goods between parties whose places of business are in different States [ ] when the States are Contracting States"); *Forestal Guarani S.A. v. Daros International, Inc.*, 613 F.3d 395, 397-98 (3d Cir. 2010) ("Because both the United States, where Daros is based, and Argentina, where Forestal is based, are signatories to the CISG and the alleged contract at issue involves the sale of goods, we agree with the parties that the CISG goverens Forestal's claim").

54. "The CISG does not preempt a private contract between parties; instead, it provides a statutory authority from which contract provisions are interpreted, fills gaps in contract language, and governs issues not addressed by the contract." *Ajax Tool Works, Inc. v. Can-Eng Manufacturing, Ltd.*, No. 01 C 5938, 2003 WL 223187, *3 (N.D. Ill. Jan. 30, 2003). "When an issue is not addressed by the [parties'] contract, the provisions of the CISG govern." *Chicago Prime Packers, Inc. v. Northam Food Trading Co.*, 320 F.Supp.2d 702, 711 (N.D. Ill. 2004), aff'd, 408 F.3d 894 (7th Cir. 2005). "Caselaw interpreting analogous provisions of Article 2 of the Uniform Commercial Code, may also inform a court whe[n] the language of the relevant CISG provisions tracks that of the UCC. However, UCC caselaw is not per se applicable." *Delchi Carrier SpA v. Rotorex Corp.*, 71 F.3d 1024, 1028 (2d Cir. 1995) (internal quotation marks omitted).

55. Although the CISG provides remedies for a fundamental breach of contract, see, e.g., CISG, Art. 25 ("A breach of contract committed by one of the parties is fundamental if it results in such detriment to the other party as substantially to deprive him of what he is entitled to expect under the contract, unless the party in breach did not foresee and a reasonable person of the same kind in the same circumstances would not have foreseen such a result"); *id.*, Arts. 45-51 (Remedies for Breach of Contract by the Seller); *id.*, Arts. 61-65 (Remedies for Breach of Contract by the Buyer), it does not expressly set forth the elements of a breach of contract claim.

---

[172]Pharmaplast Brief at 8-9; URI Brief at 7.

56.   Where neither the contract nor the convention speaks to an issue, the CISG directs courts to decide disputes based using the "general principles" upon which it is based.  CISG, Art. 7(2) ("Questions concerning matters governed by this Convention which are not expressly settled in it are to be settled in conformity with the general principles on which it is based").  Thus, courts have held, and this court agrees, that the "universal elements of [a breach-of-contract] action: formation, performance, breach and damages" apply under the CISG. *Dingxi Longhai Dairy, Ltd. v. Becwood Technology Group L.L.C.*, 635 F.3d 1106, 1108 (8th Cir. 2011) (citing *Magellan Int'l Corp. v. Salzgitter Handel GmbH*, 76 F.Supp.2d 919, 924 (N.D. Ill. 1999)); see also *Simar Shipping Ltd. v. Global Fishing, Inc.*, 540 Fed.Appx. 565, 567 (9th Cir. Sept. 9, 2013) (Unpub. Disp.) (holding that one of the general principles required for a valid contract under the CISG is "a meeting of the minds on essential terms").

57.   While many provisions of the CISG are similar to those governing contracts under California law, the CISG deviates from California contract law in two important ways.  First, under the CISG, "[a] contract of sale need not be concluded in or evidenced by writing and is not subject to any other requirement as to form.  It may be proved by any means, including witnesses." CISG, Art. 11.  In other words, there is no statute of frauds requiring that all materials contract terms be in writing.  Second, the parol evidence rule does not apply to contracts governed by the CISG, as it "permit[s] a substantial inquiry into the parties' subjective intent, even if the parties did not engage in any objectively ascertainable means of registering this intent.  Article 8(1) of the CISG instructs courts to interpret the 'statements . . . and other conduct of a party . . . according to his intent' as long as the other party 'knew or could not have been unaware' of that intent." *MCC-Marble Ceramic Center, Inc. v. Ceramica Nuova d'Agostino,* S.p.A., 144 F.3d 1384, 1387-89 (11th Cir. 1998); see also *Fercus, S.R.L. v. Palazzo*, No. 98 CIV. 7728(NRB), 2000 WL 1118925, *3 (S.D.N.Y. 2000) ("Unlike the U.C.C., the Statute of Frauds does not apply to the C.I.S.G. and parol evidence is permitted to prove that a contract has been agreed to by the parties"); *Claudia v. Olivieri Footwear Ltd.*, No. 96 Civ.

8052(HB)(THK), 1998 WL 164824, *4 (S.D.N.Y. Apr.  7, 1998) ("Although the CISG is similar to the UCC with respect to certain provisions, it differs from the UCC with respect to others, including the UCC's writing requirement for a transaction for the sale of goods and parol evidence rule"); *Filanto, S.p.A. v. Chilewich International. Corp.*, 789 F.Supp. 1229, 1238 n.  7 (S.D.N.Y. 1992) ("It should also be noted that, in provisions potentially relevant to this motion, the [CISG] essentially rejects both the Statute of Frauds and the parol evidence rule").

58.   Article 65 of the CISG governs specifications.  It provides that "[i]f under the contract the buyer is to specify the form, measurement, or other features of the goods and he fails to make such specification either on the date agreed upon or within a reasonable time after receipt of a request from the seller, the seller may, without prejudice to any other rights he may have, make the specification himself in accordance with the requirements of the buyer that may be known to him.  If the seller makes the specification himself, he must inform the buyer of the details thereof and must fix a reasonable time within which the buyer may make a different specification.  If, after receipt of such a communication, the buyer fails to do so within the time so fixed, the specification made by the seller is binding."  CISG, Art.  65.

59.   The CISG and the Incoterms set forth the duties of the buyer and the seller to perform under a contract.  The CISG provides that "[t]he seller must deliver the goods, hand over any documents relating to them and transfer the property in the goods."  CISG, Art.  30. The goods delivered must be "of the quantity, quality and description required by the contract and which are contained or packaged in the manner required by the contract." CISG, Art.  35.  Under the Incoterms, sellers of goods shipped FOB "must provide the goods and the commercial invoice . . . in conformity with the contract for sale."[173]  They must also "deliver the goods on the date or within the agreed period at the named port of shipment and in the manner customary at the port on board the vessel nominated by the

---

[173]RJN, Exh.  1 at 6 (Incoterms 2000 Definition at 50).

1    buyer."[174]

2    60.    "The seller is liable . . . for any lack of conformity which exists at the time when the risk

3           passes to the buyer, even though the lack of conformity becomes apparent only after that

4           time." CISG, Art. 36(1). The buyer has several options if there is a fundamental breach

5           by the seller. If the seller "fails to perform any of his obligations under the contract or this

6           Convention, the buyer may . . . require performance by the seller of his obligations."

7           CISG, Arts. 45-46. The buyer may also "declare the contract avoided." CISG, Art. 49.

8           Alternatively, "[i]f the goods do not conform with the contract and whether or not the price

9           has already been paid, the buyer may reduce the price in the same proportion as the value

10          that the goods actually delivered had at the time of the delivery bears to the value that

11          conforming goods would have had at that time." CISG, Art. 50. See also *Delchi Carrier*,

12          71 F.3d at 1028 ("Under the CISG, if the breach is 'fundamental' the buyer may either

13          require delivery of substitute goods or declare the contract void and seek damages" (citing

14          CISG, Art. 46, 49)); *Medical Marketing, Inc. v. Internazionale Medico Scientifica, S.R.L.*,

15          No. CIV. A. 99–0380, 1999 WL 311945, *2 (E.D. La. May 17, 1999) ("To avoid a

16          contract based on the non-conformity of goods, the buyer must allege and prove that the

17          seller's breach was 'fundamental' in nature"); *Shuttle Packaging Systems, L.L.C. v.

18          Tsonakis,* No. 1:01–CV–691, 2001 WL 34046276, *9 (W.D. Mich.  Dec. 17, 2011)

19          ("Article 64 [of the CISG] provides the seller a right to declare the contract avoided due

20          to a 'fundamental breach of contract.' The Convention affords the buyer a right to avoid

21          the contract under Article 49 for a fundamental breach").

22   61.    As for a buyer's obligations, the CISG states that "[t]he buyer must pay the price for the

23          goods and take delivery of them as required by the contract and this Convention." CISG,

24          Art. 53. The Incoterms are consistent, stating that buyers "must pay the price as provided

25          in the contract of sale,"[175] and "take delivery of the goods when they have been delivered

26          _____

27          [174]*Id*.

28          [175]*Id*. at 7 (Incoterms 200 Definition at 51).

in accordance with the seller's obligations."[176]  "The buyer is not bound to pay the price until he has had an opportunity to examine the goods, unless the procedures for delivery or payment agreed upon by the parties are inconsistent with his having such an opportunity." CISG, Art. 58(3).

62.   "If the buyer fails to perform any of his obligations under the contract or this Convention, the seller may . . . require the buyer to pay the price, take delivery or perform his other obligations . . . [or] fix an additional period of time of reasonable length for performance by the buyer of his obligations." CISG, Arts. 61-63.

63.   "A party may suspend the performance of his obligations if, after the conclusion of the contract, it becomes apparent that the other party will not perform a substantial part of his obligations as a result of (a) a serious deficiency in his ability to perform or in his creditworthiness; or (b) his conduct in preparing to perform or in performing the contract." CISG, Art. 71; see also *id.*, Art. 72(1) ("If prior to the date for performance of the contract it is clear that one of the parties will commit a fundamental breach of contract, the other party may declare the contract avoided").

## 2.   Pharmaplast's 2008 Breach of Contract Claim[177]

---

[176]*Id.*

[177]Pharmaplast asserts its claims against both Urica and URI, arguing that the two companies are alter egos and/or that URI was Urica's agent when dealing with Pharmaplast, such that both companies are liable for URI's conduct. (Pharmaplast Brief at 8.)  "Agency is 'the fiduciary relationship that arises when one person (a "principal") manifests assent to another person (an "agent") that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests an assent or otherwise consents to so act.'" *Huong Que, Inc. v. Luu*, 150 Cal.App.4th 400, 410-11 (2007) (citing RESTATEMENT 3D OF AGENCY, § 1.01)).  "The alter ego doctrine arises when a plaintiff comes into court claiming that an opposing party is using the corporate form unjustly and in derogation of the plaintiff's interests.  In certain circumstances the court will disregard the corporate entity and will hold the individual shareholders liable for the actions of the corporation."  *Mesler v. Bragg Management Co.,* 39 Cal.3d 290, 300 (1985).  "[O]nly a difference in wording is used in stating the . . . concept where the entity sought to be held liable is another corporation instead of an individual." *Las Palmas Associates v. Las Palmas Center Associates*, 235 Cal.App.3d 1220, 1249 (1991).  The "alter ego" theory applies equally to limited liability companies like URI. See *People v. Pacific Landmark*, 129 Cal.App.4th 1203,

1

**a.      Whether URI Breached the 2008 Contract**

2      64.    The parties agree their behavior shows they had a contract for the goods URI ordered

3              in purchase orders 219 through 223.[178]  They dispute the price to which they agreed in the

4              contract, however.  The court agrees that the parties had a contract.  URI submitted

5              purchase orders for products that Pharmaplast then manufactured, produced, and shipped.

6              By manufacturing, producing, and shipping the products, Pharmaplast agreed to the

7              purchase price of $80,940.00, due 90 days after the bill of lading date, contained in URI's

8              purchase order.[179]  See CISG, Art. 18(3) ("[B]y virtue of the offer or as a result of

9              practices which the parties have established between themselves or of usage, the offeree

10             may indicate assent by performing an act, such as one relating to the dispatch of the goods

11             . . . without notice to the offeror[.]  [T]he acceptance is effective at the moment the act is

12             performed").  When Pharmaplast then, upon delivery, insisted URI pay a higher price than

13

14     1212 (2005) ("[G]enerally members of a limited liability company are . . . subject to liability
       under the same circumstances and extent as corporate shareholders under common law principles
15     governing alter ego liability and are personally liable under the same circumstances and extent as
       corporate shareholders").  "Generally, alter ego liability is reserved for the parent-subsidiary
16     relationship.  However, under the single-enterprise rule, liability can be found between sister
17     companies . . . [where,] though there are two or more personalities, there is but one enterprise;
       and [ ] this enterprise has been so handled that it should respond, as a whole, for the debts of
18     certain component elements of it."  *Las Palmas Associates*, 235 Cal.App.3d at 1249-50 (internal
19     citation and quotation marks omitted); see also *Pan Pacific Sash & Door Co. v. Greendale Park,*
       *Inc.*, 166 Cal.App.2d 652, 658-59 (1958) ("[T]he trial court was warranted in concluding, as it
20     did, that each corporation was but an instrumentality or conduit of the other in the prosecution of
21     a single venture. . . .  There was such unity of interest and ownership that the separateness of the
       two corporations had in effect ceased and an adherence to the fiction of a separate existence of the
22     two corporations would, under the circumstances here present, promote injustice and make it
23     inequitable for Greendale to escape liability for an obligation incurred as much for its benefit as
       for Ralmor").  The court need not decide whether Urica and URI are alter egos or whether URI
24     was Urica's agent because even if such a relationship exists, Pharmaplast failed to prove any of
25     its claims at trial.  Thus, for purposes of this order, and despite the fact that it refers throughout
       its findings of fact and conclusions of law only to URI, the court assumes both URI and Urica can
26     be held responsible for the conduct alleged.

27             [178]URI Brief at 6; Pharmaplast Brief at 9-10.

28             [179]Oct. 30 Morning RT at 272:9-10.

that contained in the purchase order and demanded CAD payment terms, it failed to comply with its contractual obligations related to price and payment method.  See CISG, Art. 30 ("The seller must deliver the goods, hand over any documents relating to them and transfer the property in the goods, *as required by the contract* and this Convention"); cf. *Wiz Technology, Inc. v. Coopers & Lybrand*, 106 Cal.App.4th 1, 12 (2003) (quoting *Pry Corp. of America v. Leach*, 177 Cal.App.2d 632, 639 (1960)) ("'A party complaining of the breach of a contract is not entitled to recover therefor unless he has fulfilled his obligations'"); *Consolidated World Investments, Inc. v. Lido Preferred Ltd.*, 9 Cal.App.4th 373, 380 (1992) (citing *Reichert v. General Ins. Co. of America*, 68 Cal.2d 822, 830 (1968)) ("It is elementary [that] a plaintiff suing for breach of contract must prove [he] has performed all conditions on [his] part or that [he] was excused from performance").

65.   Because Pharmaplast failed to comply with its obligations and because disputes over price are considered fundamental, cf. CISG, Art. 19 ("[T]erms relating . . . to the price, [or] payment . . . are considered to alter the terms of [an] offer materially"), URI had the right to suspend its performance and require that Pharmaplast perform first by agreeing to accept the contract price and payment terms, see CISG, Art. 46(1) (if a seller fails to perform its obligations under the contract, "[t]he buyer may require performance by the seller of his obligations").

66.   Pharmaplast therefore did not prove that URI breached the 2008 contract because it did not show that it performed under that contract or that URI, by requesting that Pharmaplast accept the lower price reflected in the purchase order, was in breach of the contract.

### b.     Whether the Settlement Agreement is Void

67.   Even assuming the parties contracted at the higher price reflected in Pharmaplast's commercial invoice, and that URI breached the contract by refusing to pay that price, Pharmaplast nonetheless failed to show that URI can be held liable for the breach because it failed to prove that the 2008 contract remained enforceable following the parties' settlement of the price dispute in May 2008.

68.   On May 15, 2008, the parties reached an oral settlement of their dispute concerning the

2008 contract.  The terms of the oral agreement are memorialized in a May 17, 2008 email Atteia wrote to Moghavem confirming that Pharmaplast had agreed to honor the lower price stated in URI's purchase orders and to split the cost of demurrage.  In the email, Atteia agreed that Pharmaplast would issue a new commercial invoice that reflected the lower price and the fact that the parties had agreed to pay equal shares of demurrage costs, which at that point were approximately $11,000.  The email stated that the new invoice would reflect a purchase price of $76,000, which URI agreed to wire transfer to Pharmaplast within a few days.[180]  Both parties performed under the settlement agreement: URI wire-transferred $76,000 to Pharmaplast, and Pharmaplast released the bill of lading to it so that it could collect the goods.[181]

69.  Pharmaplast contends the settlement agreement is void because URI coerced it to accept a lower price for the goods.  The parties agree that whether the settlement is void due to economic duress is a question governed by California law,[182] as the provisions of the CISG "govern[ ] only the formation of the contract of sale and the rights and obligations of the seller and the buyer arising from such a contract."  CISG, Art. 4.  While the parties' dispute arose from a contract of sale, the agreement settling that dispute is not itself a contract of sale.  The court therefore agrees with the parties that the question of economic duress is governed by California law.

70.  California Civil Code § 1689(b)(1) permits a party to rescind a contract if its consent "was given by mistake, or obtained through duress, menace, fraud, or undue influence."  The doctrine of economic duress "come[s] into play upon the doing of a wrongful act which is sufficiently coercive to cause a reasonably prudent person faced with no reasonable alternative to succumb to the perpetrator's pressure.  The assertion of a claim known to be

---

[180]Oct. 29 Morning RT at 119:12-21; Exh. 405 (May 15, 2008 email from Atteia to Moghavem).

[181]Oct. 29 Morning RT at 117:8-13.

[182]See URI Brief at 7-8; Pharmaplast Brief at 31-32.

33

false or a bad faith threat to breach a contract or to withhold a payment may constitute a wrongful act for purposes of the economic duress doctrine." *Rich & Whillock, Inc. v. Ashton Development, Inc.*, 157 Cal.App.3d 1154, 1158-59 (1984).  A reasonably prudent person may not have reasonable alternatives and be forced to succumb to a threat to withhold payment "when the only other alternative is bankruptcy or financial ruin." *Id.* at 1159; see also *id.* at 1160-61 (finding that a settlement agreement had been signed under economic duress where the party offering to settle knew the other party "was a new company overextended to creditors and subcontractors and faced with imminent bankruptcy if not paid its final billing," and where the party accepting the settlement "strenuously protested [the other party's] coercive tactics, and succumbed to them only to avoid economic disaster to themselves and the adverse ripple effects of their bankruptcy on those to whom they were indebted"); see also *Totem Marine Tug & Barge, Inc. v. Alyeska Pipeline Service Company*, 584 P.2d 15, 17-19, 23-24 (Alaska 1978) (reversing the entry of summary judgment in favor of a purchaser and holding that a transporter that signed a release in favor of the owner of the goods after being paid $97,500 on a $300,000 invoice had raised triable issues of fact concerning economic duress, where the owner of the goods knew the transporter was in urgent need of cash and would go bankrupt if it did not receive immediate payment, and stating: "Totem has alleged that Alyeska deliberately withheld payment of an acknowledged debt, knowing that Totem had no choice but to accept an inadequate sum in settlement of that debt; that Totem was faced with impending bankruptcy; that Totem was unable to meet its pressing debts other than by accepting the immediate cash payment offered by Alyeska; and that through necessity, Totem thus involuntarily accepted an inadequate settlement offer from Alyeska and executed a release of all claims under the contract").

71.   Nonetheless, courts, "desiring to protect the freedom of contracts and to accord finality to a privately negotiated dispute resolution, are reluctant to set aside settlements and will apply 'economic duress' only in limited circumstances and as a 'last resort.'" *San Diego Hospice v. County of San Diego*, 31 Cal.App.4th 1048, 1058 (1995) (citing *Rich &*

*Whillock, Inc.*, 157 Cal.App.3d at 1158-59).

72. To prove that it experienced economic duress, a creditor must show "(1) the debtor knew there was no legitimate dispute and that it was liable for the full amount; (2) the debtor nevertheless refused in bad faith to pay and thereby created the economic duress of imminent bankruptcy; (3) the debtor, knowing the vulnerability its own bad faith had created, used the situation to escape an acknowledged debt; and (4) the creditor was forced to accept an inequitably low amount." *Id.* (citing *Rich & Whillock, Inc.*, 157 Cal.App.3d at 1156-57).

73. The court has already determined that URI legitimately disputed the payment amount demanded by Pharmaplast because Pharmaplast sought more than the contract price. Accordingly, Pharmaplast failed to prove URI knew that there was no legitimate dispute and it was liable for the full amount. It thus failed to prove the first element required to show that it entered into the settlement agreement under economic duress.

74. Even if the court were to assume that the dispute concerning the 2008 contract price was not legitimate and URI knew it was not, moreover, Pharmaplast did not show by a preponderance of the evidence that it agreed to settle the dispute due to economic duress because it did not prove that URI threatened not to pay such large amounts that they would have forced Pharmaplast into bankruptcy or caused its financial ruin.

75. Pharmaplast contends it acted under economic duress because URI threatened not to pay the full contract price and there was a risk it would default on its outstanding debt to Pharmaplast. Pharmaplast adduced evidence that at the time the parties reached the settlement agreement in May 2008, URI owed Pharmaplast $291,088.62[183] and Pharmaplast had manufactured approximately $500,000 of product for URI that was awaiting shipment in its warehouse.[184] Pharmaplast adduced no evidence, however, that URI refused to pay the $291,088.62 it owed Pharmaplast or threatened not to pay for the

[183]Exh. 209-5 (Pharmaplast Balance Sheet for URI).

[184]Oct. 30 Morning RT at 263:15-20.

goods awaiting shipment if Pharmaplast did not accept a lower price for the 2008 contract goods. Absent such facts, or any showing that Pharmaplast had a basis for believing that URI might refuse to pay these amounts in the future – i.e., absent a showing that URI affirmatively "used the situation to escape an acknowledged debt" – URI cannot be found to have coerced Pharmaplast to agree to the settlement.[185] Compare *Rich & Whillock*, 157 Cal.App.3d at 1157 ("[T]he doctrine [of duress] [ ] may come into play *upon the doing of a wrongful act* which is sufficiently coercive to cause a reasonably prudent person faced with no reasonable alternative to succumb to the perpetrator's pressure" (emphasis added)); *Goldstein v. Enoch*, 248 Cal.App.2d 891, 894-95 (1967) ("The issue in each instance is whether the defendant *intentionally exerted an unlawful pressure on the injured party* to deprive him of contractual volition and induce him to act to his own detriment" (emphasis added)); *CrossTalk Productions, Inc. v. Jacobson*, 65 Cal.App.4th 631, 645 (1998) ("Examples of such 'wrongful acts' include the assertion of a claim known to be false, a bad faith threat to breach a contract or a threat to withhold a payment"); see also *Aulakh v. 7-Eleven, Inc.*, No. 0104CV06151OWWLJO, 2006 WL 224398, *7 (E.D. Cal. Jan. 27, 2006) ("Here, there is no evidence that 7-Eleven engaged in any conduct that constitutes a coercive act. It did not make a false claim or a bad faith threat").

76. The only statements URI made were statements that it would only pay the price reflected in its purchase orders – $80,940.00 – and would not pay the higher price reflected in the commercial invoice – $95,856.00. This is a difference of $14,916.00.

77. Pharmaplast adduced no evidence that receiving $14,916.00 less for the goods covered by

---

[185]While Atteia testified that URI was pressuring Pharmaplast to sign a commission agreement covering Pharmaplast's sale of goods to Medline at approximately the time the goods were sitting in the Charlotte port, and that Pharmaplast believed URI hoped to force Pharmaplast to agree to sign the agreement by refusing to pay for the goods, Atteia did not testify that Moghavem or anyone else at URI ever threatened not to pay for the goods until the commission agreement was signed. Even had Moghavem made such a threat, moreover, there is no evidence it had the effect of pressuring Pharmaplast to sign, as Pharmaplast did not sign the commission agreement, and Atteia testified he knew that URI needed the product being held at the port and could not replace Pharmaplast as its supplier quickly enough to avoid harm to its business.

URI's purchase orders threatened it with financial ruin and/or bankruptcy. To the contrary, the evidence adduced at trial showed that Pharmaplast is a large company with three production facilities that produces billions of bandages a year for hundreds of customers. Even if URI had not paid its outstanding debt and refused delivery of the goods awaiting shipment, due to the dispute concerning the price of the 2008 goods, Pharmaplast adduced no evidence that the loss would have caused it to go bankrupt.

78.   Pharmaplast also did not prove that it felt coerced to agree to the settlement at the time the agreement was reached. None of the emails the parties exchanged while negotiating the settlement supports an inference that Pharmaplast felt URI was being coercive.

79.   Nor was Pharmaplast forced to accept an inequitably low amount. In contrast to the $97,500 settlement amount the transporter was coerced to accept in *Totem* (an amount that was less than one third the contract price), URI offered to pay Pharmaplast $14,916.00 less than what Pharmaplast wanted (or 85% of the price to which Pharmaplast believed it was entitled). Pharmaplast did not present evidence at trial that this price differential was inequitable; although Pharmaplast wished to raise the price of the products, it had not yet done so at the time URI submitted its purchase order.

80.   Pharmaplast, moreover, had more than one alternative available. It could have continued to negotiate with URI at least for some period of time or it could have sued. See *Louisville Title Insurance Co. v. Surety Title & Guaranty Co.*, 60 Cal.App.3d 781, 802 (1986) ("The determination of whether there is a reasonable alternative is made by ascertaining as a question of fact whether a reasonably prudent person would follow the alternative course"); see also *Aulakh*, 2006 WL 224398 at *8 ("Mr. Aulakh's claim of duress, even viewing the disputed facts in a light most favorable to him, similarly fails to establish that he had 'no reasonable alternative.' Rather than signing the agreement, Mr. Aulakh could have immediately sued to enforce the Franchise Agreement");.*Lanigan v. City of Los Angeles*, 199 Cal.App.4th 1020, 1034 (2011) ("Lanigan cannot establish he had no reasonable alternative to signing the Agreement. Although he contends he signed the Agreement under fear of losing his career and livelihood, Lanigan could have exercised his right to

1    appear before a [board of review]").

2  81.  For all of these reasons, even assuming the parties originally contracted for the higher

3       amount, Pharmaplast did not prove that its entry into the 2008 settlement agreement was

4       a result of economic coercion.

5  82.  The court therefore finds in favor of counter-defendants on Pharmaplast's claim for

6       breach of the 2008 contract.

7              **3.      Breach of the 2010 Contract**

8  83.  As with the 2008 contract, the parties agree that their behavior evidences that they had a

9       contract in 2010 for the purchase of the goods reflected in purchase orders 379, 383, and

10      384.[186]  Once again, the court agrees that under the CISG, the parties did form a contract:

11      URI submitted purchase orders for products that Pharmaplast manufactured and shipped,

12      in the case of purchase order 379, and manufactured in the case of purchase orders 383 and

13      384.  By taking these actions, Pharmaplast accepted URI's offer.  See CISG, Art. 18(3)

14      ("[B]y virtue of the offer or as a result of practices which the parties have established

15      between themselves or of usage, the offeree may indicate assent by performing an act, such

16      as one relating to the dispatch of the goods . . . without notice to the offeror[.]  [T]he

17      acceptance is effective at the moment the act is performed").

18  84.  The parties disagree as to the product specifications that were part of those contracts.[187]

19  85.  The evidence adduced at trial established that URI communicated the specifications for

20      each of the products it was ordering to Pharmaplast orally at meetings in Egypt, Germany,

21      and Florida.  During these meetings, URI gave Pharmaplast exemplars of its competitor's

22      products and outlined the specifications it wanted Pharmaplast to match.  The specifications

23      included requests regarding the weight of the corrugated cardboard cartons, the slot strips,

24      prep and gauze pads, the fact that the bandages should have a z- rather than a j-fold, an

25      offset release liner, and soldier-style packaging, and the fact that bulk products should be

26  ────────────────────

27  [186]Pharmaplast Brief at 9-10.

28  [187]Pharmaplast Brief at 16-17; URI Brief at 11-13.

1    packed a certain number of rolls to a case in cases of a certain size.  Three types of

2    bandage were to be blue; several others were to be transparent.

3    86.   These specifications were fundamental to the contract because URI intended to sell the

4    products to distributors for resale to institutional customers.  The distributors needed

5    products that could be stored in a particular-sized space; the end users (e.g., nurses or food

6    handlers) needed products that could be used while wearing gloves.

7    87.   Other than Caruso's July 2010 email to Makram – which specified the dimensions of the

8    cases in which bulk product was to be packed and the number of rolls to be placed in each

9    case – URI did not provide written specifications for any of the goods covered by the 2010

10   contract.  This does not change the fact that URI communicated detailed specifications for

11   the products it was ordering to Pharmaplast and that Pharmaplast agreed to the

12   specifications, first by representing to URI in Florida that there would be no problem

13   matching the competitor's products, and then by accepting the 2010 purchase orders and

14   manufacturing product pursuant to them.  Unlike the orders URI had placed in the past,

15   moreover, Pharmaplast knew that URI did not want it to use Pharmaplast's default

16   specifications and that it had instead provided specifications because of the new market

17   URI was entering.  Pharmaplast knew the specifications were important to URI and knew

18   URI wanted its products to match those of its competitor. Pharmaplast never communicated

19   to URI that it wanted written specifications submitted with the purchase orders; nor did it

20   state that the purchase orders were deficient because they were not accompanied by written

21   specifications.  Pharmaplast was not free to change the specifications that were part of the

22   parties' contract unilaterally, without notice to URI, after accepting the purchase orders.

23   See CISG, Art. 65 ("If the seller makes [a] specification himself, he must inform the buyer

24   of the details thereof and must fix a reasonable time within which the buyer may make a

25   different specification").

26   88.   The fact that the product Pharmaplast manufactured, and the way in which it was boxed

27   and packaged, did not conform to the parties' agreement was a fundamental breach of the

28   contract.  Specifically, it deprived URI of what it was entitled to expect under the contract

and resulted in goods that could not be sold to URI's institutional customers. Atteia himself acknowledged at trial that he knew Pharmaplast was breaching the contract, at least when it packed different numbers of rolls of product in cases that were a different size than URI requested.[188]

89. Citing *Chicago Prime Packers, Inc. v. Northam Food Trading Co.*, 320 F.Supp.2d 702, 710 (N.D. Ill. 2004), Pharmaplast asserts that URI did not meet its burden of demonstrating that the goods it manufactured were non-conforming. Specifically, it argues that URI received samples of the goods but nonetheless instructed Expeditors to ship the product, and that URI's witnesses did not cite specific examples of non-conformity in photographs of the goods admitted at trial.[189]

90. In *Chicago Prime Packers*, the court held that the plaintiff bears the burden of establishing non-conformity. *Id.* URI met this burden. It showed that it provided certain specifications to Pharmaplast, but that Pharmaplast did not produce goods that matched those specifications. Atteia himself acknowledged that he knew Pharmaplast packed more rolls per case than URI had specified; he said this occurred because it was not possible to satisfy URI's order for special dimension cases as the order did not meet the minimum order quantity of Pharmaplast's printer and URI was pressuring it to ship the goods as fast as possible.[190]

91. Neither the fact that URI accepted shipment of the goods nor the fact that none of URI's witnesses specifically "pointed out the supposed nonconformity of the goods" depicted in the product photographs offered in evidence compels a different conclusion.

92. The mere fact that URI was willing to accept shipment of the goods is not proof that the goods were conforming. It is clear from the emails between the parties at the time URI accepted shipment that URI had concerns about the conformity of the goods. Even if

---

[188]Oct. 30 Afternoon RT at 370:20-372:18.

[189]Pharmaplast Brief at 17.

[190]Oct. 30 Afternoon RT at 370:20-372:18.

URI's conduct in accepting the goods for shipment somehow called call into question the concerns it expressed concerning non-conformity in contemporaneous emails, the evidence adduced at trial showed that although URI learned of the fact that some products were non-conforming in the months prior to shipment, it was not aware of the extent of the non-conformity until it accepted shipment. The evidence showed that during the months following its placement of the 2010 purchase orders, URI became aware that Pharmaplast was producing some non-conforming goods.  The samples it received from Pharmaplast between September 2010 and February 2011, and the January 2011 emails between Magdy and Edward in which they agreed to pack a different number of rolls in each case than URI had requested alerted URI to the fact that Pharmaplast was not manufacturing every product in a manner that was consistent with the parties' agreement.  URI believed in January 2011, however, that the number of rolls of bulk product per case had been resolved once Atteia told Magdy and Edward to pack the products as requested by URI. URI did not discover that Pharmaplast had packed the rolls differently until March 9, 2011, when it received the packing list from Pharmaplast.  It was not until David's February 24, 2011 email to Daroubakhsh, moreover, in which she detailed all of the defects she had discovered in the most recent shipment of samples, that it appears the company learned the true extent of problems with the goods.  By that time, of course, the goods had already been shipped.  Thus, although URI knew that the products Pharmaplast was shipping to it had some defects at the time it accepted shipment, it was not aware of the extent of the defects until after the goods had left Egypt.  As a result, URI's agreement to accept shipment does not reflect that it waived non-conformity in goods it did not discover were non-conforming until after the product had left Egypt.

93. Pharmaplast, moreover, discouraged URI from visiting Egypt in January 2011 to discuss the problems in person because of the civil unrest in that country.  Consequently, had URI planned to inspect the goods to confirm its suspicion that they were non-conforming, it would not have been able to do so absent authorizing their shipment to the United States.

94. For these reasons, the fact that URI accepted shipment of the goods does not undermine

the weight of the evidence adduced at trial, which conclusively showed that the goods were non-conforming.

95. Second, the fact that URI's witnesses did not cite specific non-conforming aspects of goods pictured in photographs admitted into evidence does not contradict or otherwise undermine URI's witnesses' testimony regarding the non-conformity of the goods. URI's attorney tactically may not have asked such questions because there was already ample evidence of non-conformity supporting witness testimony about the subject; this included Atteia's admission and the parties' email exchanges regarding URI's concerns as to whether the goods conformed to the specifications.

96. Because Pharmaplast had fundamentally breached the contract by manufacturing, boxing, packing and shipping non-conforming goods, when the goods reached the port in Charlotte, URI had the right to refuse to pay full price for the goods, and instead request that Pharmaplast either (1) give it a discount of $50,000, which URI estimated was the cost of repackaging the goods and modifying them to the specifications; (2) put the goods in a bonded, third-party warehouse to have a neutral third party determine the extent to which the goods conformed and provide an estimated cost of modification; or (3) pay 50 percent of the purchase price, calculate the cost of modifying the goods, and pay Pharmaplast any difference between the remaining half of the purchase price and the modification cost. See CISG, Art. 50 ("If the goods do not conform with the contract and whether or not the price has already been paid, the buyer may reduce the price in the same proportion as the value that the goods actually delivered had at the time of the delivery bears to the value that conforming goods would have had at that time").

97. Pharmaplast argues that URI breached the contract because even under Article 50, the buyer must take delivery of the goods.[191] The buyer does not have an obligation to take delivery of goods before it has had the opportunity to inspect them, however. The parties' contract does not address the purchaser's right of inspection. Accordingly, the CISG

_____

[191]Pharmaplast Brief at 17.

applies.  Article 58(3) states: "The buyer is not bound to pay the price until he has had an opportunity to examine the goods, unless the procedures for delivery or payment agreed upon by the parties are inconsistent with his having such an opportunity."  CISG, Art. 58(3); see also Secretariat Commentary to Article 58, ¶ 5 ("Paragraph (3) states the general rule that the buyer is not required to pay the price unless he has had an opportunity to examine the goods.  It is the seller's obligation to provide a means for the buyer's examination prior to payment and handing over").[192]  A contract for CAD payment is not inconsistent with an opportunity to inspect the goods.  See Secretariat Commentary to Article 58, ¶ 8 ("It should be noted that since the buyer loses the right to examine the goods prior to payment of the price only if the procedures for payment or delivery 'agreed upon by the parties' are inconsistent with such right, he does not lose his right to examine the goods prior to payment where the contract provides that he must pay the price against the handing over of the documents after the arrival of the goods.  Since payment is to take place after the arrival of the goods, the procedure for payment and delivery are consistent with the right of examination prior to payment").

98. Pharmaplast nonetheless refused to allow URI to inspect the goods until it had accepted delivery of them and paid full price for them.  Because Pharmaplast refused to give URI an opportunity to inspect the goods, URI was unable to do so and it therefore had no obligation to take delivery of or pay for them at the time it asked that Pharmaplast discount the price.

99. Because it failed to prove that it satisfied its own obligations under the contract, in that it provided non-conforming goods and refused to allow URI to inspect the goods once they arrived at the port, and because URI had a right to request a reduced price based on the non-conformity of the goods, Pharmaplast failed to prove at trial that URI breached the 2010 agreement.   The court therefore finds in favor of counter-defendants on

---

[192]See http://cisgw3.law.pace.edu/cisg/text/secomm/secomm-58.html (accessed on August 5, 2014).

1    Pharmaplast's claim for breach of the 2010 contract.

2        **C.    Pharmaplast's Fraud Claims**

3    100.    Pharmaplast also asserts an intentional misrepresentation claim against Moghavem, Urica

4         and URI and a false promise claim against Urica and URI.  There is no distinction between

5         an intentional misrepresentation and a false promise claim.  Indeed, "a false promise is

6         simply a type of intentional misrepresentation." *Tarman v. State Farm Mutual Automobile*

7         *Insurance Co.*, 2 Cal.App.4th 153, 159 (1991); see also *Doe v. Gangland Productions,*

8         *Inc.*, 730 F.3d 946, 960 (9th Cir. 2013) (same).  An intentional misrepresentation or false

9         promise is "[t]he suggestion, as a fact, of that which is not true, by one who does not

10        believe it to be true."  CAL. CIV. CODE § 1572.   Both intentional misrepresentation and

11        false promise are types of fraud.  *United States ex rel. All Day Electric Co. v. Stronghold*

12        *Engineering, Inc.*, No. 11CV1465 JLS (JMA), 2012 WL 3782545, *2 (S.D. Cal. Aug. 31,

13        2012) ("[I]ntentional misrepresentation . . . is a form of fraud"); *Epitech, Inc. v. Cooper*

14        *Industries, PLC*, No. 11–cv–1693–JM–WVG, 2011 WL 5118767, *1 (S.D. Cal. Oct. 28,

15        2011) ("False promise is a type of fraud"); *Padayachi v. IndyMac Bank*, No. C 09–5545

16        JF (PVT), 2010 WL 4367221, *4 (N.D. Cal. Oct. 28, 2010) ("Intentional

17        misrepresentation is a form of fraud").

18   101.    Because Pharmaplast's intentional misrepresentation and false promise claims are based on

19        tort, not contract law, California law rather than the CISG governs these claims.  See

20        CISG, Art. 4 (The CISG "governs only the formation of the contract of sale and the rights

21        and obligations of the seller and the buyer arising from such a contract").

22   102.    The elements of a fraud claim are "(1) [a] misrepresentation; (2) with knowledge of falsity;

23        (3) intent to defraud, i.e. to induce reliance; (4) justifiable reliance; and (5) resulting

24        damage." *L'Garde Inc. v. Raytheon Space and Airborne Systems*, 805 F.Supp.2d 932, 944

25        (C.D. Cal. 2011); see also *Lazar v. Superior Court*, 12 Cal.4th 631, 638 (1996) ("'The

26        elements of fraud, which gives rise to the tort action for deceit are (a) misrepresentation

27        (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or

28        'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e)

1    resulting damage,'" citing 5 B. Witkin, SUMMARY OF CAL. LAW, Torts, § 676, p. 778 (9th

2    ed. 1988)).

3    103.   Pharmaplast's fraud claims are premised on an allegation that Moghavem induced

4    Pharmaplast to agree that it would manufacture products for URI's institutional product

5    line by assuring Atteia that URI would have no problem making timely, CAD payments

6    because the profit margin on institutional products was so much higher than it on retail

7    products.[193]   Pharmaplast alleges that Moghavem never intended to pay full price for the

8    products and actually intended to extort price concessions from Pharmaplast to compensate

9    URI for sums it believed Pharmaplast owed under the commission agreement URI tried

10   unsuccessfully to get Pharmaplast to sign concerning its sale of product to Medline.[194]

11   104.   An alleged promise to do or not do something in the future is not actionable fraud unless

12   the party making the promise does so with no present intention of performing it.   See

13   *Tenzer v. Superscope*, 39 Cal.3d 18, 30 ((1985) ("[P]roof that a promise was made and

14   that it was not fulfilled is [not] sufficient to prove fraud. . . .   Rather, 'something more

15   than nonperformance is required to prove the defendant's intent not to perform his

16   promise'"); *Tarmann v. State Farm Mutual Auto. Ins. Co.*, 2 Cal.App.4th 153, 158-59

17   (1991) ("To maintain an action for deceit based on a false promise, one must specifically

18   allege and prove, among other things, that the promisor did not intend to perform at the

19   time he or she made the promise and that it was intended to deceive or induce the promisee

20   to do or not do a particular thing. . . .   Simply put, making a promise with an honest but

21   unreasonable intent to perform is wholly different from making one with no intent to

22   perform and, therefore, does not constitute a false promise"); see also *Nastrom v.*

23   *JPMorgan Chase Bank, N.A.*, No. 1:11cv01998 DLB, 2012 WL 5522795, *5 (E.D. Cal.

24   Nov. 14, 2012) ("[F]ailure to carry out a promise 'does not constitute fraud unless, when

25

26   [193]Amended Final Pretrial Conference Order ("Pretrial Order"), Docket No. 186-1 (Sept.

27   26, 2013), at 14-16.

28   [194]*Id.*

45

the promise was made, the defendant secretly intended not to perform or knew that he could not perform,'" quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1176 (2d Cir. 1993)).

105.   At trial, Pharmaplast adduced evidence that Moghavem told Atteia that, unlike in the past, URI would be able to pay Pharmaplast timely and on CAD terms once the parties entered the new venture together.

106.   Pharmaplast failed to prove, however, that the representation was false and that Moghavem knew it was false at the time he made it. Pharmaplast contends the court can infer that Moghavem's promise was knowingly false from three facts: (1) that URI never paid for the goods in purchase order 379; (2) that URI had refused to accept and pay for goods in 2008; and (3) that Moghavem raised the issue of Pharmaplast's sales to Medline in the March 31, 2011 email he sent to Atteia.[195]

107.   The court does not agree.  As the court has found, URI adduced ample evidence that the parties' disputes concerning the 2008 and 2010 purchase orders were the result of Pharmaplast's failure to perform its obligations under the contracts.  They thus do not support an inference that Moghavem habitually promised to pay with no intent of doing so: when Moghavem promised Atteia that URI would make timely CAD payments in the future, he did not promise to do so even if the goods Pharmaplast produced and delivered were non-conforming.  For this reason, the fact that URI never paid for the goods covered by purchase order 379 does not show that Moghavem's promise was false.

108.   More fundamentally, even if there were no evidence that Pharmaplast failed to perform its obligations under the 2010 contract, merely showing that URI failed to fulfill its promise does not suffice to prove that it did not intend to honor the promise at the time it was made. See  *Jhaveri v. ADT Sec. Services, Inc.*, 2:11–CV–4426, 2012 WL 843315, *4-5 (C.D. Cal. Mar. 6, 2012) ("[F]raudulent intent cannot be proven . . . by simply pointing to the defendant's subsequent failure to perform as promised. . . .  That Defendant failed to

---

[195]Pharmaplast Brief at 23.

perform on these promises does not plausibly give rise to an inference that Defendant never intended to honor the contract"); *Richardson v. Reliance Nat. Indem. Co.*, No. C 99-2952 CRB, 2000 WL 284211, *5 (N.D. Cal. Mar. 9, 2000) ("Adopting plaintiff's argument [that a mere allegation that defendant subsequently failed to perform its contractual obligations suffices to state a fraud claim] would effectively eviscerate the effect of Rule 9(b) in every case of promissory fraud.  Under plaintiff's theory, every breach of contract would support a claim of fraud so long as the plaintiff adds to his complaint a general allegation that the defendant never intended to keep her promise.  Plaintiff provides no support for such an exception to the strictures of 9(b)"); see also *Audigier Brand Management v. Perez*, No. CV 12–5687–CAS (Rzx), 2012 WL 5470888 *5 (C.D. Cal. Nov. 5, 2012) ("[P]laintiff's allegations of false promises are insufficiently particular to satisfy Rule 9(b), because plaintiff offers no underlying facts on which its beliefs are founded – other than allegations relating to defendant's post-agreement conduct").

109.    The court similarly finds unpersuasive Pharmaplast's argument that URI's refusal to pay for the goods that were the subject of the 2008 contract tends to show that Moghavem's statement was knowingly false when he made it.  The court has found that Pharmaplast was the party that failed to perform under the 2008 contract, and that  URI had the right under the contract to refuse to pay the higher price Pharmaplast demanded.  URI's refusal to pay this price therefore does not support an inference that its subsequent refusal to pay for goods in 2010 due to Pharmaplast's failure to perform was for the improper purpose of extracting lower prices from Pharmaplast to offset the commissions URI believed it was owed on Pharmaplast's sales to Medline.

110.    The court finds more persuasive Pharmaplast's argument that the March 31, 2011 email Moghavem sent Atteia shows that URI's refusal to accept and pay for the goods covered by purchase order 379 was motivated by URI's desire to pay less for the goods in order to recoup a portion of the commissions URI believed it was owed on Pharmaplast's Medline sales.  Even this, however, is not sufficient to show that at the time he promised timely CAD payment, Moghavem did not intend to pay Pharmaplast the full price of the

products URI had ordered.  Even if the March 31, 2011 email shows that Moghavem was motivated, at least in part, not to accept the goods and tender full payment in March 2011, nothing in the email suffices to show that at the time Moghavem spoke with Atteia in Miami in 2010, he intended not to fulfill his promise.

111.   URI, moreover, adduced evidence that it invested a great deal of money and engaged in substantial planning to enter the institutional market.  It spent more than $150,000 to retain Rojas and Bolling to assist it in selling the goods.  It invested $100,000 on trips to Pharmaplast, customers, and trade shows.  And it had advance purchase orders for the goods Pharmaplast was to manufacture for it.  The court can infer that none of these expenditures would have been made had URI's intention been to extort price concessions from Pharmaplast, conduct which could have imperiled or even resulted in termination of its relationship with its supplier.  For these reasons, Pharmaplast failed to prove at trial that Moghavem, URI, and Urica are liable for fraud because it failed to show that Moghavem knew he was making a false promise at the time he promised Pharmaplast URI would make timely CAD payments on all orders for the institutional product line.[196]

112.   The court therefore finds in favor of counter-defendants on Pharmaplast's fraud claims.

### D.   Pharmaplast's Common Counts

113.   "A common count claim is a claim based on a debt owed by a defendant to a plaintiff, generally for goods or services rendered." *G. Hirsch & Co., Inc. v. AmerisourceBergen Corp.*, No. C 06-00608 CW, 2006 WL 1348568, *2 (N.D. Cal. May 17, 2006) (citing A. Corbin, CORBIN ON CONTRACTS, ¶ 20 (1963) (common counts are statements "that the defendant is indebted to the plaintiff for a variety of commonly occurring reasons, such as money had and received, money lent, work and labor done, and goods sold and delivered. They are allegations of indebtedness, and the action may be properly described as indebitatus assumpsit")).

---

[196]Even had Pharmaplast shown that Moghavem made a false promise, the court would find that Pharmaplast's reliance on that promise was unreasonable, as Atteia himself testified that he never trusted Moghavem again after the parties' dispute concerning the 2008 purchase orders.

114. A common count "is not a specific cause of action, however; rather, it is a simplified form of pleading normally used to aver the existence of various forms of monetary indebtedness." *McBridge v. Boughton*, 123 Cal.App.4th 379, 394 (2004). It provides an equitable remedy. See *Batt v. City and County of San Francisco*, 155 Cal.App.4th 65, 82 (2007) ("A constructive trust is not an independent cause of action but merely a type of remedy, and an equitable remedy at that. The same is true of injunctive relief, declaratory relief, an accounting, and the common count" (internal quotation marks and citations omitted)); see also *Rotea v. Izuel*, 14 Cal.2d 605, 611 (1939) ("'The action for money had and received is based upon an implied promise which the law creates to restore money which the defendant in equity and good conscience should not retain. The law implies the promise from the receipt of the money to prevent unjust enrichment. The measure of the liability is the amount received,'" quoting *Pollak v. Staunton*, 210 Cal. 656, 665 (1930)); *Moya v. Northrup*, 10 Cal.App.3d 276, 281 (1970) ("The common counts are in theory based on express or implied promises to pay money. The obligation to pay is rested upon the equitable principle of preventing unjust enrichment as applied to the particular circumstances which have arisen between the parties," citing 5 CAL.JUR.2D rev., Assumpsit, §§ 2-4, pp. 643-47; and King, *The Use of the Common Counts in California*, 14 SO. CAL. L. REV. 288-92, 305 (1941)).

115. Because Pharmaplast's common count claims are not based on contract law, California law rather than the CISG governs these claims. See CISG, Art. 4 (The CISG "governs only the formation of the contract of sale and the rights and obligations of the seller and the buyer arising from such a contract").

116. "In California, the essential elements for a common count are (1) a statement of indebtedness in a certain sum; (2) consideration (i.e ., goods sold); and (3) non-payment." *G. Hirsch & Company v. Amerisourcebergen Corp.*, No. C06-00608 CW, 2006 WL 1348568, *2 (N.D. Cal. 2006) (citing *Farmers Insurance Exchange v. Zerin*, 53 Cal.App.4th 445, 460 (1997)); see also *Miniace v. Pacific Maritime Ass'n*, 424 F.Supp.2d 1168, 1186 (N.D. Cal. Feb. 23, 2006) ("Common count is used for obtaining recovery

49

from a debt stemming from a contract. The only essential allegations of a common count are '(1) the statement of indebtedness in a certain sum, (2) the consideration, i.e., goods sold, work done, etc., and (3) nonpayment,'" quoting *Farmers Insurance Exchange*, 53 Cal.App.4th at 460).

117.  When a common count claim is based on the same facts and seeks recovery of the same amount as a claim that fails, the common count claim fails as well. See, e.g., *Mar Partners 1, LLC v. American Home Mortgage Servicing, Inc.*, No. 10–cv–02906 WHA, 2011 WL 11501, *4 (N.D. Cal. Jan. 4, 2011) ("'When a common count is used as an alternative way of seeking the same recovery demanded in a specific [claim], and is based on the same facts,' it does not survive if the underlying claim does not survive," citing *McBridge v. Boughton*, 123 Cal.App.4th 379, 394 (2004)); *Community Infusion Services Inc. v. National Organization for Rare Disorders Inc.*, No. SACV 11–00719–JVS(MLGx), 2011 WL 2420224, *5 (C.D. Cal. June 14, 2011) ("Because the Court dismisses CIS's claim for breach of contract, it also dismisses CIS's claim for common counts"); *Farmers Insurance Exchange*, 53 Cal.App.4th at 460 ("Inasmuch as we have concluded Farmers has no [ ] equitable lien, it has no claim to the money had and received by defendant [pursuant to that lien]"); *Zumbrun v. University of Southern California*, 25 Cal.App.3d 1, 14 (1972) ("[I]f [a] plaintiff is not entitled to recover under one count in a complaint wherein all the facts upon which his demand is based are specifically pleaded, it is proper to sustain a demurrer to a common count set forth in the complaint, the recovery under which is obviously based on the set of facts specifically pleaded in the other count'" (internal citation omitted)).

### 1.    Goods Sold and Delivered

118.  A claim for goods sold and delivered is a type of common count. "For a goods sold and delivered claim, it is sufficient to allege that the defendant was indebted to the plaintiff at a specific time in a stated sum on an account for goods sold and delivered by the plaintiff to the defendant at the defendant's request, and no part of the debt was paid." *United States ex rel. Hajoca Corp. v. Aeroplate Corp.*, No. 1:12–cv–1287–AWI–BAM, 2013 WL

50

3729692, *3  (E.D. Cal. July 12, 2013) (citing *Abadie v. Carrillo*, 32 Cal. 172, 175 (1867)).

119.   Pharmaplast's claim for goods sold and delivered fails because Pharmaplast never delivered the goods to URI, and because the court has found that Pharmaplast failed to manufacture goods that conformed to the parties' contract, and that URI had a right not to accept delivery of them.  See *Zumbrun*, 25 Cal.App.3d at 14 (noting that relief on a common count is in the nature of a constructive trust, and stating "[o]ne cannot be held to be a constructive trustee of something he has not acquired.  One must have acquired some money which in equity and good conscience belongs to the plaintiff or the defendant must be under a contract obligation with nothing remaining to be performed except the payment of a sum certain in money").  In other words, because Pharmaplast failed to prove its breach of contract claim, its goods sold and delivered claim, which is based on the same facts and seeks recovery of the same amount, fails as well.

120.   The court therefore finds in favor of counter-defendants on Pharmaplast's goods sold and delivered claim.

### 2.   Open Book Account

121.   "The term "book account" means a detailed statement which constitutes the principal record of one or more transactions between a debtor and a creditor arising out of a contract or some fiduciary relation, and shows the debits and credits in connection therewith, and against whom and in favor of whom entries are made, is entered in the regular course of business as conducted by such creditor or fiduciary, and is kept in a reasonably permanent form and manner and is (1) in a bound book, or (2) on a sheet or sheets fastened in a book or to backing but detachable therefrom, or (3) on a card or cards of a permanent character, or is kept in any other reasonably permanent form and manner."  CAL. CODE CIV. PROC. § 337a; see *Interstate Group Administrators, Inc. v. Cravens, Dargan & Co.*, 174 Cal.App.3d 700, 708 (1985) ("A 'book account' is defined as a detailed statement, kept in a book [or computer], in the nature of debit and credit, arising out of contract or some fiduciary relation. . . .  [T]he book [must] show against whom the charges are made. . . .

51

It must also be made to appear in whose favor the charges run," citing *Joslin v. Gertz*, 155 Cal.App.2d 62, 65 (1957) (internal quotation marks omitted)); see also *In re Roberts Farms, Inc.*, 980 F.2d 1248, 1252 (9th Cir. 1981) (noting that an open book account is a "detailed statement which constitutes the principal record of one or more transactions between a debtor and a creditor," citing CAL. CODE CIV. PROC. § 337a)); *Eurodrip, USA, Inc. V. B&B Drip Irrigation, Inc.*, No. 1:09-cv-00716-AWI-SMS, 2009 WL 2365845, *5 (E.D. Cal. July 31, 2009) ("An open book account is a book account, that is, a detailed statement, kept in a book or otherwise reasonably memorialized, in the nature of debit and credit, arising out of contract or some fiduciary relation, which demonstrates against whom and in whose favor the charges run").  A book account is "open" if "the debtor has made some payment on the account, leaving a balance due." *Eurodrip*, 2009 WL 2365845 at *5.

122.  The Statement of Account[197] Pharmaplast introduced at trial satisfies the requirements for a book account, as Makram testified that the entries are detailed, permanent records that reflect the ongoing relationship between Pharmaplast and URI and the amounts owed and paid by URI.[198]

123.  Pharmaplast cannot prevail on its open book claim, however, because the evidence it adduced at trial shows that URI actually has a credit with Pharmaplast of $50.88.  Makram testified that the credit of $200,009.64 applied to the account on June 1, 2011 was an accounting entry reflecting that the goods from purchase order 379 were returned to Pharmaplast.  Pharmaplast concedes that its statement of account for URI shows a credit balance of $50.88, but argues that the June 1, 2011 credit was simply an accounting entry that the court should overlook.

124.  Even were the court to consider the amount owed on February 9, 2011 – the preceding entry on the statement – rather than the credit URI had on June 1, 2011, Pharmaplast failed

---

[197]Exh. 209.

[198]Oct. 29 AM RT at 198:2-202:11.

1   to prove that URI owes it this amount.[199]  As noted, URI showed that it never received
2   consideration in exchange for its indebtedness because Pharmaplast manufactured and
3   shipped non-conforming goods for which it had the right to seek a discounted price.  When
4   it did so, Pharmaplast refused to give any discount and returned the goods to Egypt.  Thus,
5   as with Pharmaplast's claim for goods sold and delivered, its open book account claim fails
6   because its breach of contract claim fails.
7   125.   The court therefore finds in favor of counter-defendants on Pharmaplast's open book
8          account claim.
9   126.   Any conclusions of law that are deemed to be findings of fact are incorporated herein as
10         such.

## III.  CONCLUSION

For the reasons stated, the court concludes that Pharmaplast did not prove any of its causes
of action against counterdefendants at trial and that it is therefore entitled to take nothing by way
of its counter-complaint.

DATED: August 8, 2014

_Margaret M. Morrow_
_____
MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE

[199]The entry for February 9, 2011 indicates that URI owes Pharmaplast $200,009.64.
(Exh. 209.)

53